# United States Court of Appeals
## For the First Circuit

No. 08-2481

UNITED STATES OF AMERICA,

Appellee,

v.

KELMIT OQUENDO-RIVERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,

Torruella and Boudin, Circuit Judges.

Héctor L. Ramos-Vega, Assistant Federal Public Defender, with whom Joseph C. Laws, Jr., Federal Public Defender, was on brief for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief Appellate Division, were on brief for appellee.

November 5, 2009

**BOUDIN, <u>Circuit Judge</u>**. Kelmit Oquendo-Rivera ("Oquendo") seeks review of a district court decision revoking supervised release and sentencing him to a further term in prison. The circumstances are unusual and we conclude that further proceedings are required.

The pertinent background is as follows. In 2000, Oquendo pled guilty to possessing cocaine base with intent to distribute and was sentenced to 78 months in prison and five years of supervised release. He left prison in October 2004 and began serving his supervised release term. In the following three and a half years, it appears that Oquendo attended technical school refrigeration courses and ran a car detailing business. During this period, he was tested for drug use and never tested positive.

On February 21, 2008, Oquendo was present along with other individuals at a residence in the town of Yauco, Puerto Rico, in the early afternoon when 10 to 15 police officers arrived with a warrant to search the residence. Shooting then occurred and, according to the government, Oquendo shot at a police officer-- Rashid Feliciano--who then shot Oquendo as the latter was fleeing from the residence. There is no doubt that Feliciano shot and badly wounded Oquendo; the question is whether Oquendo was mistakenly identified by Feliciano as his shooter. Whether Oquendo was present merely as an innocent visitor (as he claims) or there for some improper purpose bears on this issue but in either event

the ultimate issue is whether Oquendo had a gun and fired at Feliciano.

After the Yauco incident, Oquendo was charged in the district court with violating several of his conditions of release: committing a crime, frequenting a place where controlled substances are distributed or used, and failing to notify his probation officer of his arrest. 18 U.S.C. § 3583(d) (2006). Also included in the same motion were several other charges that concerned an unrelated incident two years earlier in which Oquendo was stopped and questioned by an officer while walking with a person who had a history of drug trafficking.[1]

By far the most serious charge was shooting at a police officer, and separate criminal charges under Puerto Rico law were filed against Oquendo in a local Puerto Rico court; whether or not formally dismissed, it appears that local charges have not been pursued. However, the district court convened a supervised release revocation hearing at which it heard testimony from several of the police officers involved in the Yauco incident, including Feliciano, as well as testimony by Oquendo.

Feliciano testified that when he arrived at the scene a person shot from a window of the house, then exited the window and

---

[1]Those charges were associating with a criminal, failing to notify his probation officer about being questioned by police, and failing to submit a monthly supervision report. Although based on a much earlier event, the charges were advanced only after the Yauco incident.

ran on a ledge beside the house while shooting at Feliciano with a revolver held in the person's left hand. Feliciano specifically said the weapon involved was a revolver (as opposed to a magazine-loaded gun). Feliciano testified that he shot at the person and hit him in the leg, and that the person hesitated but did not fall and then jumped a fence and kept running. When Oquendo was later found wounded, Feliciano identified him as the person who had shot at him and fled.

Numerous officers had been present but no other officer testified to seeing Oquendo with a gun of any type or to seeing anyone shooting at Feliciano. Two officers other than Feliciano testified at the hearing that a shootout occurred, and one testified to seeing another man who was not Oquendo shoot at a different officer (Juan Tirado) with a revolver; both said the other man ultimately escaped.[2] No officer testified to seeing two different individuals shoot from the house and flee.

Oquendo testified that he went to the residence on the day of the shooting to provide a car detailing quote for a van owner who was present there; seeing drugs in the house (apparently through an open door or window), Oquendo decided not to enter but

---

[2]Tirado testified that he saw a man who was not Oquendo fire at him from the balcony of the house, exit and flee the house's front entrance with a revolver in his right hand, jump a fence, and escape--never to be arrested. Officer Jose Brasero similarly saw a man who fled the front entrance of the house at the beginning of the shooting.

merely to wait outside the door for someone to bring him the van owner's keys. At that point, he says, he saw two or three individuals running at him with weapons drawn; not realizing that they were police officers, he ran toward the back of the house and jumped a fence and landed on the other side where he was hit in the leg by a bullet and badly injured.

Oquendo was eventually found, seriously wounded and bleeding, by Officer Hector Castillo at a neighboring house; Oquendo said that he had dragged himself there after being shot. Castillo searched Oquendo and found money, two cellular phones, and keys belonging to different cars on his person. Castillo also said that he found a small bag of cocaine tucked in between the money; Oquendo claims instead that Feliciano later produced the bag and told Oquendo to "shut up" when Oquendo denied that the bag was his. Five individuals were found and arrested in the house where the police also found crack cocaine and a loaded pistol with an extended magazine; but no revolver was found there or anywhere in the area.

Oquendo ultimately was taken to the hospital on a stretcher. There, asked by an officer whether he wanted to be charged with using or selling the bag of cocaine allegedly found on his person, Oquendo said he would rather be charged with using--a less serious charge. The government is hard put to argue that this

amounted to a confession of use or possession, given the way the question was asked and the incentive created for the answer given.

In argument at the hearing, Oquendo's counsel pointed out that the shootout scene was confusing and no officer other than Feliciano claimed to have seen Oquendo shoot at anyone; that Oquendo is right-handed--which the government does not dispute-- whereas Feliciano had said that the man who shot at him held the gun in his left hand; and that Oquendo's leg injury was of such severity that, contrary to Feliciano's claim, Oquendo could never have been shot and then have leapt over the fence (Feliciano himself admitted that he found no blood on or near the fence).

Defense counsel also argued that because Feliciano had shot and badly injured the fleeing Oquendo, the officer himself had good reason to say that he recognized Oquendo as the man who had shot at him. Feliciano himself could have been subject to discipline or liability if he had shot at a retreating individual who was not directly implicated in a serious offense. And, given that the scene had been a confused one and another individual had fired at the police, the possibility exists that Feliciano indeed believed himself to have been fired upon and simply made a mistake as to who had done it.

Nevertheless, at the close of the hearing the district court found from the bench that Oquendo had committed a grade A violation by "having the gun and shooting the agent." The district

judge observed that adrenalin could account for a wounded man's ability to leap over a fence. The court revoked Oquendo's supervised release and sentenced him to five years' imprisonment, the maximum term allowed under the statute. 18 U.S.C. § 3583(e)(3). The district judge did not address or rely on the lesser alleged violations relating to the Yauco incident or the incident two years before.

After failing on a motion for reconsideration, Oquendo appealed from the district court's revocation decision and sentence. It is common ground that the government's burden at the hearing was to prove by a preponderance of the evidence a violation of one or more conditions of release, 18 U.S.C. § 3583(e)(3); United States v. Whalen, 82 F.3d 528, 531-32 (1st Cir. 1996); United States v. Portalla, 985 F.2d 621, 622 (1st Cir. 1993). If such a violation were proved, the district judge's decision whether to revoke supervised release and what penalty to impose would be reviewed only for abuse of discretion. United States v. McInnis, 429 F.3d 1, 3-4 (1st Cir. 2005); Whalen, 82 F.3d at 532.

The finding of violation in this case--that Oquendo had a weapon and fired at an officer--is a factual determination reviewed by us primarily for clear error. See Whalen, 82 F.3d at 532. This, we have said, would require a "definite and firm conviction" that the finding was erroneous, United States v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006) (quoting United States

v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005), cert. denied, 546 U.S. 1222 (2006)), a conclusion made difficult because the reviewing court must interpret the evidence in the light most favorable to the government, Portalla, 985 F.2d at 622, and credibility is largely a matter for the fact-finder, Ivery, 427 F.3d at 72.

Because the district judge chose to believe one and not the other of two witnesses before him, it might seem that the choice of whom to credit resolves the matter. But the credibility of a story depends not only on the seeming sincerity of witnesses and their demeanor in the courtroom but also on more objective criteria: for example, consistency (both internal to the testimony and with the physical evidence), probability, access of the witness to information, his bias or interest, and corroboration or unexplained contradiction of his testimony by undisputed testimony or empirical evidence. As the Supreme Court has said, "[d]ocuments or objective evidence may contradict the witness' story; or the story may itself be so internally inconsistent or implausible on its face that . . . the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985).

Here, both of the key witnesses had a stake in the outcome. Oquendo's testimony was the more consistent and obviously he knew what had happened; Feliciano, by contrast, was confronted

with a confused scene and his testimony is marred by at least two significant tensions yet to be discussed. Still, the district judge could have credited the independent testimony of Castillo that Oquendo had a small amount of cocaine in his pocket. This showed neither that Oquendo had a gun nor that he fired it, but any cocaine on Oquendo's person might seem like a loose thread that could unravel his otherwise sympathetic claim of three years of rehabilitation and innocent presence at the scene.

Nevertheless, this is a case in which real doubt exists about Oquendo's guilt. Apart from Feliciano, no one among the 10 to 15 officers present at the scene testified that Oquendo was armed or had fired. According to another officer's testimony, a different individual did shoot at the police and flee, so Feliciano could have been mistaken as to the shooter. Nor is it easy to imagine the right-handed Oquendo shooting, as Feliciano claimed, with his left hand. And the weapon Oquendo supposedly used was never found; while the district court said it might have been hidden, it is hard to understand how a badly wounded man could have secreted it from a serious search.[3]

A further discrepancy in Feliciano's testimony is even more troubling. Feliciano testified unequivocally that he shot

---

[3]The court speculated that Oquendo's revolver might not have been found because houses in the area were so small and close together that "[t]here are 20,000 little places to hide a gun there or throw a gun out." But nothing explains how a crawling, bleeding man could have disposed effectively of his weapon.

Oquendo before Oquendo went over the fence.  Quite apart from the lack of blood near or on the fence, the damage to Oquendo's leg was savage; Oquendo testified that when he was shot, he felt like his "leg was hanging," held in place only by the skin, and he had to drag himself by holding onto his shoe which was heavy.  Castillo testified that Oquendo was screaming in pain and could neither walk nor jump when he was found; in fact his leg was broken and months later Oquendo was still limping with a rod holding his knee to his ankle.

The notion that Oquendo could have jumped over a substantial fence--seemingly from a videotape of the scene earlier in the day at least four or five feet high--after he was shot is hard to accept without more explanation.  The district judge speculated that this could be the result of adrenalin, but there was no medical testimony of any kind, let alone proof that adrenalin could boost anyone with the damage suffered by Oquendo over a sizably high fence.  A fact finder may rely on common knowledge, United States v. Amado-Nunez, 357 F.3d 119, 121-22 (1st Cir.), cert. denied 542 U.S. 914 (2004), but this hardly seems to fall into that category.

Conversely, the district judge did not mention the possibility that the known but escaped shooter could have been the person who fired at Feliciano.  He also did not discuss Feliciano's unqualified statement that the shooter shot with his left hand

while the evidence indicated that Oquendo was right-handed--except to deem the issue "immaterial" without explaining why--nor did he discuss Oquendo's seemingly good record after his release and colorable innocent explanation for his presence, the lack of identification by any other officer, or Feliciano's own possible motive for testifying inaccurately.

Criminal trials--which this effectively was--are no place for naivete; Oquendo had once dealt drugs, may have had drugs in his wallet on this occasion and--if involved in a new drug venture--had good reason to be desperate to escape. Nothing we know makes it certain that Oquendo is innocent of the shooting; and it is still less certain that he is innocent of less serious violations that were charged but not resolved. But the evidence that he shot at Feliciano is assuredly shaky and we cannot on this record, at least on the basis of the explanation provided, sustain the finding of Oquendo's guilt. See generally United States v. Forbes, 181 F.3d 1 (1st Cir. 1999).

Juries are not required--indeed, as a joint lay body are scarcely able--to give detailed explanations for their decisions; but trial judges in proceedings of this kind are expected to give some explanation, Morrissey v. Brewer, 408 U.S. 471, 489 (1972); Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973), unless the basis is plain from the record. How much explanation depends on the circumstances--for example, on the closeness of the case, the

nature and extent of gaps or doubts, and the plausibility of suppositions used to fill the gaps or answer the doubts. In some cases, a result, possibly defensible, may not have been adequately explained or supported.

That is our conclusion in this case. Given the relatively weak evidence, we think the decision is undermined by the reliance on guesswork about adrenalin to account for Oquendo's ability to jump the fence, the lack of explanation for the missing weapon he allegedly carried, and the failure to discuss a series of points that seem relevant and undercut Feliciano's testimony and other points that gave at least some indirect support to Oquendo's testimony.[4] Whether in further proceedings more evidence and more explanation can justify the result is a matter for the future, if the government chooses to pursue this particular charge.

We have great respect for the experience and skill of the district judge but think that it makes sense for further proceedings to be conducted by another district judge. Reversal because of an error in instructions or a grant of summary judgment rarely calls for a such a change, which always has some costs in

---

[4]See United States v. Stephenson, 928 F.2d 728, 733 (6th Cir. 1991) (remanding a revocation of supervised release because of a lack of reliable evidence and the district court's insufficient explanation of the reasons and evidence supporting revocation); United States v. Smith, 767 F.2d 521, 524 (8th Cir. 1985)(remanding for the district court to augment its explanation of the basis for probation revocation); United States v. Lacey, 648 F.2d 441, 444-45 (5th Cir. Unit A June 1981) (same), cert. denied, 456 U.S. 961 (1982).

-12-

efficiency; but where the judge is the decider of facts, it is hard to ask him to put aside a belief sincerely arrived at and look at the evidence through fresh eyes. Other districts sometimes so provide in their rules for a change of judges in such a situation, D.N.H. R. 40.2(b); and we think that at least from the standpoint of appearance this would be the better course in this case.

The decision and sentence of the district court are set aside and the matter remanded for further proceedings in accordance with this decision.

It is so ordered.