# United States Court of Appeals
## For the First Circuit

No. 15-1998

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL MARINO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

James L. Sultan, with whom Audrey M. Grace and Rankin & Sultan were on brief, for appellant.
Francesco Valentini, Attorney, Criminal Division, United States Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, and Carmen M. Ortiz, United States Attorney, were on brief, for appellee.

August 9, 2016

**THOMPSON**, <u>Circuit Judge</u>.

### Stage Setting

Paul Marino is a fraudster extraordinaire. Back in the early 2000s, for example, he ran a fairly elaborate scheme designed to swindle New Yorkers out of their property. In one instance Marino forged the rightful owners' signatures on documents so he could transfer their property (without their consent, obviously) to himself (under an alias). He then transferred the property to an entity called "RYDPHO Holdings" — with "RYDPHO" standing for "Rip You Da Phuck Off," apparently. Later he helped sell the property for $185,000. And he eventually wired some of the proceeds through bank accounts of companies he controlled. Fresh off the apparent success of this deception, he tried to do the same thing to other property owners. But they discovered what he was up to before he could complete the transfers.

Nabbed by law enforcement, Marino pled guilty in New York federal court to a single count of wire fraud. <u>See</u> 18 U.S.C. § 1343. Probation filed a presentence-investigation report detailing his lengthy criminal record, which included convictions for things like fraud, larceny (<u>e.g.</u>, he had stolen a generator while awaiting sentencing on the scheme described in the preceding paragraph), forgery, and conspiracy to use — and use of — unauthorized access devices, as well as revocation of supervised

- 2 -

release and re-imprisonment based on a fraud offense. And ultimately, a judge sentenced him to 14 months in prison, 36 months of supervised release, and restitution of $185,000. Among the conditions of supervised release were that he "notify" probation "at least ten days prior to any" employment change and "within seventy-two hours of being arrested or questioned by a law enforcement officer," pay restitution "at a rate of 10% of [his] gross monthly income," and "not commit another federal, state, or local crime."

Marino served his jail time but soon found himself in trouble again, with probation asking the Massachusetts federal court to revoke his supervised release (that court had taken jurisdiction over his supervised release). As relevant here, probation alleged that he (1) ran a construction and home-inspection business from his house without telling probation; (2) failed to notify probation within 72 hours of police contact — like after he got stopped for speeding, for example; (3) did not make the required restitution payments; (4) committed two new crimes — defrauding Dell, Inc. (an electronics company) and the Massachusetts Department of Transitional Assistance ("DTA," from now on, a state agency that runs public-assistance programs like food stamps and job training); and (5) tampered with electronic-monitoring equipment probation installed in his house (a judge had

imposed the no-tampering condition after police arrested him for violating other supervised-release conditions).[1]

Responding to probation's charges, Marino filed a memo admitting to violating the first three violations, acknowledging the judge should revoke his supervised release, and declaring no need to "conven[e] protracted mini-trials" to address the other infractions (the state courts should handle the fraud issues, he wrote). The judge held a revocation hearing. And hoping to prove the nonconceded-to charges as well, the government called four witnesses: Cheryl Fontaine, who had hired Marino as a contractor; Officer Jeremy DeMello, who logged a fraud complaint received from Scott Hudson of Dell's fraud unit — Hudson was based in Texas; Detective Raul Espinal, who helped search Marino's home for equipment stolen from Dell; and Probation Officer Fredrick Lawton, who testified about a number of things, including Marino's construction work, his fraud against Dell and DTA, and his tampering with his electronic-monitoring device. The government also introduced documentary evidence, including photos of two "return" boxes shipped back to Dell from Marino's home address (boxes filled with construction materials or rocks, not Dell

---

[1] The government alleged other violations. But a district judge concluded that the government failed to prove those charges. So we say nothing further about them.

products, we add); a list of items — with identifying serial numbers — that Dell reported stolen, items that the police recovered from Marino's house; contracts and bank checks involving Marino's construction work; and Marino's application for DTA benefits, plus his correspondence with DTA. Marino, for his part, did not testify or present evidence.

At the end of the hearing the judge found facts confirming that Marino had committed new crimes by defrauding Dell and DTA and that he had tampered with his electronic-monitoring gadget. So the judge revoked Marino's supervised release and sentenced him to 12 months in prison (the top of the uncontested sentencing range of 6-12 months) followed by 24 months of supervised release, with the judge imposing as a special condition that he spend the first 12 months of his supervised release at Coolidge House — a residential reentry center in Boston. The judge also "reimpose[d]" "[a]ll previously imposed conditions."

Marino now appeals, raising three broad arguments. His lead claim is that the judge erred by admitting hearsay evidence concerning Dell's fraud investigation of him. Next he insists that insufficient evidence supported the judge's finding that he had cheated Dell and DTA and that he had monkeyed around with the electronic-monitoring equipment. And last he contends that the judge's sentence requiring him to spend a year at Coolidge House

is substantively unreasonable. We analyze these arguments sequentially, noting additional facts as needed. And when all is said and done, we affirm.

**Hearsay**

Marino thinks the judge slipped up by admitting two groups of hearsay statements: the first involves a list of items — together with their serial numbers — that Dell reported stolen; the second involves Probation Officer Lawton's testimony summarizing a report he received from Hudson, Dell's fraud investigator. As Marino sees things, the judge's actions infracted the "limited confrontation right" in federal revocation proceedings. See United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005); see also Morrissey v. Brewer, 408 U.S. 471, 489 (1972); Fed. R. Crim. P. 32.1(b)(2)(C). Reviewing for abuse of discretion, Rondeau, 430 F.3d at 48, we spy no error.

Guiding Principles

A supervised releasee facing a revocation proceeding has a qualified right "to . . . question any adverse witness unless the [judge] determines that the interest of justice does not require the witness to appear." See Fed. R. Crim. P. 32.1(b)(2)(C) (emphasis added). What this means is that hearsay testimony can get in. See, e.g., Rondeau, 430 F.3d at 48. But the judge should balance "the releasee's right to confront witnesses with the

government's good cause for denying confrontation." Id. In doing that, the judge should consider the hearsay testimony's reliability and the government's rationale for not producing the declarant (with "declarant" being legalese for the person who made the statement). See id.; see also United States v. Mulero-Díaz, 812 F.3d 92, 96 (1st Cir. 2016).

On the reliability front, caselaw holds (so far as relevant here) that "conventional substitutes for live testimony," like "affidavits, depositions, and documentary evidence," ordinarily possess sufficient indicia of reliability, Gagnon v. Scarpelli, 411 U.S. 778, 782 n.5 (1973) — as does hearsay testimony about statements that are corroborated by other evidence, are detailed, or were repeated by the declarant without any material changes, see Rondeau, 430 F.3d at 48-49; United States v. Portalla, 985 F.2d 621, 624 (1st Cir. 1993). This is a nonexhaustive catalog, as particular cases vary. See Rondeau, 430 F.3d at 48. Anyway, on the explanation front, caselaw recognizes that "concern . . . with the difficulty and expense of procuring witnesses from perhaps thousands of miles away" is a paradigmatic example of the type of situation that might call for the admission of hearsay evidence at a revocation proceeding. See Gagnon, 411 U.S. at 782 n.5.

## Reliability

Over a hearsay objection by Marino's counsel, the judge admitted a list of items, with serial numbers, that Dell reported stolen to the police. Officer DeMello, who had talked by phone with Dell's Hudson about Marino's fraudulent orders, testified that someone had given that list to "the detectives" — the fair inference being that the "someone" was a Dell employee. Marino calls the list unreliable, pouncing on the fact that Officer DeMello did not know key particulars, like who had compiled it. But Detective Espinal's separate testimony helped confirm the list's reliability: As the police searched Marino's home with a warrant in hand, Detective Espinal's colleague, Detective Scott Brown, "had a list of all the items" the police were looking for, along with the items' "serial numbers." And, as Detective Brown wrote in a section of his report (which the judge admitted into evidence on Marino's lawyer's motion), the police found "[e]ach and every" sought-after "item" at that locale. This constellation of corroborating evidence lends ample indicia of reliability to the list. See Rondeau, 430 F.3d at 48 (noting how corroboration helps with reliability).

On to Marino's attack on the reliability of Probation Officer Lawton's summary of Dell's fraud investigation. And this is what you need to know:

Over another hearsay objection by Marino's attorney, the judge let Probation Officer Lawton testify about how after he caught wind of Dell's fraud report to the police, he called Dell's Hudson. Hudson told him, Probation Officer Lawton added, that "Marino had been having" Dell ship expensive electronic equipment "to his house" — though after getting the merchandise, Marino would call Dell, say that he wanted to return the items, and then send back instead boxes filled with "construction" materials (like "sheetrock") or "rocks," <u>without</u> the equipment. More, again according to Probation Officer Lawton's testimony of what Hudson said, Marino once told Dell that he did not get a computer monitor that he had ordered, that it might have been stolen off his porch, and that Dell should send him a new one. Dell obliged. But a little later he told Dell that "he didn't want" the new "monitor," though the one he eventually "returned was the first monitor" — <u>i.e.</u>, the monitor he claimed had been <u>stolen</u>.

Contesting the evidence's trustworthiness, Marino stresses that "Hudson's putative statements regarding . . . the alleged fraud were neither written nor sworn under oath." True. But we think this evidence nonetheless passes the reliability

threshold.  For one, the statements are packed with details.  See Portalla, 985 F.2d at 624 (explaining that "detail" is a reliability indicator).  For another, they are corroborated by evidence developed by the police — not only did law enforcement find the items Dell had reported stolen at Marino's residence, but Detective Brown's report (the part admitted at Marino's counsel's behest) noted that Marino's wife had said during the search that Marino "had ordered that stuff" from Dell.  See Rondeau, 430 F.3d at 48 (emphasizing that corroboration is a reliability indicator).  Also, Hudson consistently articulated the same version of events — he spoke to Officer DeMello and Probation Officer Lawton separately, and their respective testimony about his comments mirrored one another in every material way.[2]  See id. (finding it

_____

[2] Here's a sampling of what Officer DeMello said Hudson had said:

> So what had happened was [Hudson] called and he stated that [Dell] had been getting invoices from a . . . Mr. Marino in New Bedford, . . . and stated that he had shipped him TVs, computers, and computer-related equipment over a period of . . . a year, a year and a half, . . . and during that time there were several fraudulent transactions made, . . . one in which [Dell] had shipped a TV and when the TV was supposed to have arrived Mr. Marino contacted [Dell] and stated that he never received a TV and that it must have been stolen off of his front porch.  And then [Dell] shipped him a second TV, . . . and then he had contacted [Dell] again and said that the second one wasn't . . . the one that he wanted . . ., so [Dell] told him to return it for a refund, however when he returned it for a refund he actually returned the original one that was reported as

- 10 -

significant that the declarant "never changed her description" of the key events).  And given this concatenation of circumstances, Marino has no leg to stand on here.[3]

### Explanation

Marino complains that the government never explained at the hearing why it chose not to produce any of the following: (a) Hudson or another Dell witness, (b) an affidavit from Hudson or another Dell employee, or (c) Dell business records — for simplicity, we sometimes refer to this stuff as the "pined-for evidence."  Anyhow, because of the government's failure (Marino's argument continues, at least implicitly), the judge never performed the required balancing.  This argument has some bite.

---

being stolen and not the second one [Dell] shipped him, which [Dell] had done I guess through matching the serial numbers.

Also [Hudson] had stated that [Dell] shipped [Mr. Marino] several TVs and computers over a time, . . . amounting to somewhere over $20,000[,] and [Mr. Marino] would ask to return these items and when he returned them instead of [Dell] getting back a TV or computer equipment or whatever [Dell] had shipped him, [Dell] would instead get construction materials, sheetrock, slats of wood, things of that nature . . . .

[3] Marino argues against the "reliability" of "hearsay evidence" touching on the DTA fraud.  But he débuts that argument in his reply brief.  So we deem it waived. See, e.g., United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008).

But given the specific circumstances of this case, it cannot prevail.

Yes, the government did not explain below why it relied on hearsay testimony rather than, say, on Dell business records (i.e., documents that fall within an exception to the hearsay rule) or on an affidavit from a Dell employee (an affidavit is substantially more reliable because it is both in writing — eliminating reliance on the listener's memory — and sworn to). We wish the government had: such an explanation would undoubtedly help in working through the balancing test. And we expect the government to have an explanation of this sort at the ready in future cases (prosecutors would do well to remember that warning, obviously).

But here is why we find no abuse of discretion in this particular instance. Both sides played up the balancing test below — the government (to cite just one example) reminded the judge that he had to "balance" Marino's "right to confront witnesses with the government's good cause for denying confrontation." And, after reading the relevant caselaw, the judge straight-out said that he had done precisely that. Again, the government did not directly tell the judge what its good cause was. It focused its energies instead on defending the evidence's reliability, perhaps because Marino centered his attacks on reliability — he said

- 12 -

nothing about the government's explanation (or lack of one), which means that he did not (as he does now) fault the government for not explaining why it passed on presenting the pined-for evidence. But remember, the record shows that Hudson worked out of Texas. And remember too, Marino copped to several infractions before the hearing, conceded the judge should revoke his supervised release, and declared no need for any "mini-trials" to deal with the other alleged infractions. Well, given these specific circumstances, we accept the idea that it was reasonable for the government not to incur "the difficulty and expense of procuring" Hudson "from . . . thousands of miles away," see Gagnon, 411 U.S. at 782 n.5, just so he could testify at a hearing where Marino did not dispute the need to revoke his supervised release and saw no grounds for "mini-trials" — which pours cold water on his the-government-should-have-produced-Hudson argument. Of course, there remains the troubling fact that the government did not secure an affidavit from Hudson. While such a failure might in many cases tip the balance against the government, here the numerous reliability indicators — especially the self-confirming match between the numbers on the list and the numbers on the items found in Marino's residence — provide enough support to sustain the ruling as within the judge's discretion.

The abuse-of-discretion standard is not "appellant-friendly," to put it mildly, because it requires "strong evidence that the . . . judge indulged a serious lapse in judgment." Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995). And ultimately, despite the able arguments of Marino's lawyer, we see nothing concerning the pined-for evidence that rises to that level in this unique case — so we let the judge's ruling stand. See generally Dopp v. Pritzker, 38 F.3d 1239, 1253 (1st Cir. 1994) (stressing that most "appellants who consider themselves aggrieved by discretionary decisions of the district court . . . are destined to leave this court empty-handed").

## Sufficiency of the Evidence

That takes us to Marino's sufficiency claims — claims premised on his belief that the government offered insufficient evidence to establish his Dell or DTA fraud or his tampering with the electronic-monitoring gizmo. Before tackling his arguments, we briefly sketch the legal rules governing our review.

### Guiding Principles

The government must prove it is more likely true than not (the usual preponderance standard) that the defendant violated a condition of supervised release. See United States v. Oquendo-Rivera, 586 F.3d 63, 66 (1st Cir. 2009) (citing 18 U.S.C. § 3583(e)(3)); see also United States v. Cruz, 120 F.3d 1, 4 (1st

- 14 -

Cir. 1997) (en banc) (describing the preponderance standard). If the government meets its burden and the judge revokes the defendant's supervised release, we inspect his factual findings for clear error — clear error (for those not in the know) means the judge got things "wrong with the force of a 5 week old, unrefrigerated, dead fish," Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 46 (1st Cir. 2013) (quoting S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001)); and we examine his revocation decision only for abuse of discretion, see, e.g., Oquendo-Rivera, 586 F.3d at 66.

Sufficiency challenges are notoriously hard to win, because "(a) the evidence must be viewed in the light most agreeable to the government, (b) the judge's choice among competing but plausible inferences from the evidence cannot as a matter of law be clearly erroneous, and (c) credibility calls" are for the judge — not for us. United States v. Vixamar, 679 F.3d 22, 29 (1st Cir. 2012); see also Oquendo-Rivera, 586 F.3d at 67; Portalla, 985 F.2d at 622. No surprise, then, that Marino's challenges come up short.

### Dell Fraud

Evaluated using the just-described techniques, the record here features sufficient evidence to sustain the judge's finding that Marino defrauded Dell. Recall first Officer DeMello's

- 15 -

testimony: He said that Dell's Hudson ID'd Marino as the suspect in a merchandise-ordering scam, reporting conduct that bore the hallmarks of fraud — e.g., he referenced Marino's false claims that merchandise never showed up and discussed Dell's receipt of "return" boxes containing construction materials or rocks instead of Dell items. And he added that Dell later gave a detailed inventory of the pilfered products, complete with serial numbers (a reasonably inferable inference, given that we take the evidence in the light most flattering to the government). Now also recall Detective Espinal's testimony and Detective Brown's report: Both confirm that police found the items Dell reported stolen within Marino's home, with Detective Brown's report also noting that when he explained to Marino's wife that the police had a warrant to search for Dell products that "were never paid for," she said, "that's all Paul, he ordered the stuff."

Unfortunately for Marino, his arguments against the evidence's sufficiency are not difference makers. He suggests, for starters, that the judge did not admit Officer DeMello's testimony for the truth. The judge made this not-for-the-truth comment after Marino's lawyer argued that the officer's testimony about Hudson's report was "rank hearsay." But once the government concluded its case, the judge reviewed the pertinent precedent (e.g., Rondeau), performed the required balancing, and deemed the

- 16 -

hearsay "reliable" enough to be admitted — which cuts the legs out from under Marino's initial argument. He also calls the evidence unreliable. But we have already explained why that argument is not a winner. Finally, he says nothing establishes that he "had ordered any computers" or "that he returned any boxes to Dell." But the record, read as it must be, in the light most amiable to the government, shows otherwise.[4]

Enough said about the sufficiency of the evidence on the Dell-fraud charge.

### DTA Fraud

As for the DTA-fraud issue, Marino does not dispute that he applied for public assistance with DTA, certifying under the pains and penalties of perjury that he did not earn any income. Neither does he dispute that he knew (thanks to the form he signed) that he had to notify DTA "within 10 days" of any change in income. Nor does he dispute that he never reported any income to DTA. Instead he contends that the government provided insufficient evidence to prove that he actually received public assistance from

---

[4] Marino says in his supplemental pro se brief that the "IP address" used to purchase the Dell products is not associated with his residence and that he did not "own" that "IP address." We see no record support for either claim. And the evidence actually in the record — read in the required light — is sufficient to link him to the Dell fraud under the preponderance standard.

DTA or that he earned any income during his supervised release. Neither contention is convincing.

Taking the evidence and permissible inferences in the light most flattering to the government, we think sufficient proof supports the judge's finding that Marino got DTA public assistance. Among other evidence, the government introduced a letter DTA sent Marino during the relevant period warning him that his "benefits may stop" if he "did not keep" a scheduled "appointment" with a DTA official — the obvious inference from this is that Marino collected public assistance from DTA. Equally devastating to this aspect of his claim, Marino concedes in his pro se supplemental brief that he actually did get a "public assistance monthly allowance."

Viewed in the proper light, the evidence and reasonable inferences also amply support the finding that Marino earned income that he should have told DTA about. Marino, recall, stipulated at the revocation hearing to having worked in the construction industry without probation's blessing. And the evidence admitted at the hearing showed that Cheryl Fontaine hired Marino as a contractor and sent thousands of dollars' worth of checks to "CWD Construction Company Inc." — a company she had contacted by email after doing some online research. Marino points out that Fontaine made these checks payable to CWD, not to him. But there was

evidence that Marino "ran" CWD — Marino's own lawyer called CWD "Mr. Marino's company." From this evidence the judge could reasonably count at least some of Fontaine's payments as income to Marino, income that — the uncontested evidence shows — could have caused DTA to reduce or even eliminate Marino's public-assistance benefits.

## Device Tampering

Marino does not contest that a condition of release required him to submit to "location monitoring technology as directed by the . . . supervising officer" and "abide by all of the program requirements and instructions provided by the . . . supervising officer related to the proper operation of the technology." Nor does he contest that he put "glue or plastic substance" on the base unit of his electronic-monitoring device without permission. Instead he says that he added the glue "to protect the device from being separated from its power adapter while [his] dog jump[ed] around playing with [his] daughter." He insists too that this no-tampering condition must require proof of some "nefarious effect" to result in a violation — and, his argument continues, the government provided no evidence that the device "did not work properly."

The simple answer to Marino's argument is that Probation Officer Lawton instructed him not "to tamper" with the device,

adding that if Marino "had some concerns about it" he had to bring them up with probation.  Given this testimony, together with the condition's clear-as-day language, the judge could supportably conclude that the "program['s] requirements" barred Marino from making <u>any</u> unauthorized changes to the device — not just "nefarious" changes that actually disabled the device.[5]

**Sentencing**

Marino last argues that the special condition that he spend the first year of supervised release at Coolidge House makes his sentence "substantively unreasonable" and is "unwarranted by the evidence."  But this argument meets the same fate as his preceding ones.

When a judge revokes a defendant's supervised-release term, the new sentence may include an additional supervised-release stint, <u>see</u> 18 U.S.C. § 3583(h), including a requirement that he live at a reentry center like Coolidge House, <u>see id.</u> § 3563(b)(11).  Of course, any supervised-release condition must

- be "reasonably related," <u>id.</u> § 3583(d)(1), to "the nature and circumstances of the offense and the history and

---

[5] Through his supplemental pro se missive, Marino argues — as he did during his allocution at sentencing — that Probation Officer Lawton had it in for him from the get-go and that this bias led to his violations.  But the judge rejected Marino's blame-shifting theory.  And Marino gives us no persuasive reason to upset the judge's conclusion.

characteristics of the defendant," id. § 3553(a)(1), and to the need to deter and protect others and to rehabilitate the defendant, see id. § 3553(a)(2)(B)-(D);

- "involve[] no greater deprivation of liberty than is reasonably necessary" for deterring criminal conduct, protecting the public, and rehabilitating the defendant, id. § 3583(d)(2); see also id. § 3553(a)(2)(B)-(D);

- be consistent with policy statements issued by the United States Sentencing Commission, see id. § 3583(d)(3); and

- "be supported by the record," United States v. Garrasteguy, 559 F.3d 34, 42 (1st Cir. 2009).

A judge has "significant flexibility" in formulating special conditions of supervised release. Id. at 41. And given his front-row seat at the proceeding, we review his selection of supervised-release conditions for abuse of discretion, knowing that "[t]he touchstone of abuse of discretion review . . . is reasonableness" and that "any one of several sentences may be reasonable in a particular case." United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011). What this means is that we will jettison the judge's sentencing decision "only if" it "falls outside the 'expansive boundaries' of the entire range of

- 21 -

reasonable sentences."  Id. (quoting United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)).[6]

Marino insists that a one-year stay at Coolidge House is "assuredly" excessive, given that he has "no convictions for crimes of violence or drug offenses" and has "employable skills."  But he has not shown us how these commonplace offender characteristics outweigh the obvious need for deterrence, public protection, and rehabilitation (a.k.a., the statutory sentencing goals):  As the judge supportably found — based on the copious evidence presented at the hearing — Marino has a "long history" as a "con man," a history that includes (a) the wire-fraud conviction that led to his original supervised-release term, as well as (b) the schemes to defraud Dell and DTA (proven below) that triggered the supervised-release revocation, plus (c) his many larceny and forgery convictions.  Marino's recidivist ways show that ordinary supervised-release conditions will not help achieve the statutory goals of sentencing, making it reasonably necessary to impose

---

[6] The parties fight over whether Marino said enough below to preserve his substantive-reasonableness challenge.  But we need not say who is right, because Marino's challenge fails under either abuse-of-discretion or plain-error review.  See United States v. Ruiz-Huertas, 792 F.3d 223, 228 & n. 4 (1st Cir.) (taking that approach in a similar case after noting the uncertainly surrounding whether a substantive-reasonableness claim must be preserved below), cert. denied, 136 S. Ct. 258, 258–59 (2015).

- 22 -

greater restrictions.  Or so the judge reasonably could — and <u>did</u> — conclude.

Trying a slightly different tack, Marino argues that Coolidge House is too restrictive, citing to the center's rules controlling the residents' comings and goings and limiting their cell-phone, internet, and computer use on the center's premises. According to his pro se supplemental brief, he needs a job to earn the "several thousand dollars a month" his family needs to sustain its lifestyle.  And — his argument continues — the center's restrictions will severely crimp his ability to find work.  He also complains that Coolidge House is too far from his family, noting how the center is about 60 miles from where his wife and daughter live.  None of these arguments persuades, however.

Take Marino's the-center-is-too-restrictive argument. We agree that a judge should not lightly impose restrictions of the type complained about here.  But the judge did not impose the Coolidge House special condition lightly — again, he hit Marino with it only after the earlier supervised-release conditions had indisputably failed.

Also, Marino's own counsel conceded at the revocation hearing that the judge should "buil[d]" a "structured environment" into the sentence.  And surely the center's coming-and-going limitations are part and parcel of a "structured environment."  On

top of that, Marino's complaints about the center's cell-phone, internet, and computer restrictions conveniently ignore that residents in his shoes (i.e., residents not dealing with court-imposed release conditions restricting their internet and computer use) can use — repeat, can use — "the internet for job searching purposes at a local career resource center, or as part of their employment if required as part of their job responsibilities or duties" (a quote lifted from the center's resident handbook that Marino relies on).

Marino is also wrong in suggesting that the special condition denies him his fundamental right to associate with his family because the Coolidge House is located about 60 miles from his family's home. Almost every supervised-release condition restricts a felon's liberty. See, e.g., United States v. Smith, 436 F.3d 307, 310 (1st Cir. 2006). The line separating a permissible condition from an impermissible one depends on whether, given the case's facts, the "particular restriction is clearly unnecessary." Id. Marino's Coolidge House stay may be inconvenient for him and his family. But we cannot say that the condition is "clearly unnecessary," especially given his proven track record of backsliding into crime.[7]

---

[7] Marino thinks that rehabilitation would "best be accomplished" by letting him live with his family and score work in his home town. But Marino has already shown that ordinary

As a fallback, Marino argues that his one-year community-confinement term "directly contravenes" section 5F1.1 of the federal Sentencing Guidelines. That section says that "[c]ommunity confinement may be imposed as a condition of probation or supervised release." Application note 2 to that section states (emphasis ours) that "[c]ommunity confinement generally should not be imposed for a period in excess of six months" and adds that "[a] longer period may be imposed to accomplish the objectives of a specific rehabilitative program, such as drug rehabilitation." But by using the word "generally" the Sentencing Commission injected some "flexibility" into this area — thus if a "judge has specific rehabilitative goals in mind, and believes that those goals cannot be accomplished within six months, the judge may impose a longer period of community confinement." See United States v. Stephens, 347 F.3d 427, 430 (2d Cir. 2003) (citing United States v. Lominac, 36 F.3d 1095, 1994 WL 510242 (4th Cir. 1994) (per curiam) (unpublished)). True, the judge here never said the word "rehabilitative." But we can infer that the judge had Marino's rehabilitation in mind, especially from the judge's comments about how Marino needs "a structured environment" to set

---

conditions of supervised release will not do the trick, giving the judge ample reason to conclude that he needs a more "structured environment."

him back on the straight and narrow and how Marino must stay at Coolidge House for a year because "insofar as supervised release goes, he's a failure."

Accusing the judge of not really "consider[ing]" section 5F1.1, Marino calls the judge's explanation insufficient to justify giving him double the "length of time in community confinement . . . suggested by the Sentencing Commission." But he also insists that his lawyer said enough at the hearing to preserve the section-5F1.1 issue for appeal. And we can infer that the judge considered and rejected Marino's points before settling on one year of community confinement, with the judge's comments about Marino's past failures justifying the need for a more "structured environment" — which means the condition imposed is grounded in a plausible view of the circumstances and culminates in a "defensible overall result." See United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc) (emphasizing that the telltale sign of a reasonable sentence is a defensible outcome supported by a plausible rationale); see also United States v. Colón de Jesús, No. 15-1962, 2016 WL 4056033, at *3 (1st Cir. July 29, 2016) (emphasizing that even "an unexplained condition of supervised

release may be upheld as long as the basis for the condition can be inferred from the record").

## Wrap Up

Having carefully considered all of Marino's claims (including some that merit no discussion), we **affirm** the judgment below in all respects.