# United States Court of Appeals
## For the First Circuit

No. 18-2013

UNITED STATES OF AMERICA,

Appellee,

v.

YAIRA T. COTTO-FLORES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Luis Rafael Rivera-Rodríguez, with whom Allan Amir Rivera-Fernández was on brief, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

August 10, 2020

**THOMPSON, Circuit Judge.** Once again, we are called upon to explain how a federal government in which Puerto Ricans have no vote may regulate them more extensively than it can most every other American citizen. Bound by our precedent, here we go.

One fateful day in March 2015, Yaira Taines Cotto-Flores, then a 26-year-old English teacher, drove a 14-year-old student to a motel in San Lorenzo, Puerto Rico and had sex with him. That was a crime. See P.R. Laws Ann. tit. 33, §§ 4770, 4772. And to anyone familiar with our federal system of government, which trusts the states to handle most local criminal offenses (and thereby protects their citizens from federal overreach), it might have seemed like a case for Puerto Rico to prosecute and punish. After all, "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity." Bond v. United States, 572 U.S. 844, 858 (2014). By limiting federal jurisdiction over local criminal conduct, and leaving room for state prosecutors to exercise discretion, the Constitution not only protects states' "sovereign" policy choices; it safeguards "the liberty of the individual from arbitrary power." Id. at 864–65. It gives people "within a State" the right to be free from federal prosecution for "laws enacted in excess" of Congress's delegated "governmental power[s]," Bond v. United States, 564 U.S. 211, 222, 225 (2011), powers that are carefully "limited" within the fifty states, United States v. Morrison, 529 U.S. 598, 607,

- 2 -

618 (2000) ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States."). But not in Puerto Rico.!

As the Supreme Court frequently reminds us, Puerto Rico is not a "State" but part of the "Territory or other property *belonging* to the United States." Harris v. Rosario, 446 U.S. 651, 651 (1980) (quoting U.S. Const., Art. IV, § 3, cl. 2) (emphasis added). For that reason, in important ways, the U.S. government can treat the island and its residents differently. See id.; Puerto Rico v. Shell Co., 302 U.S. 253, 257 (1937) (citing Balzac v. Porto Rico, 258 U.S. 298, 304, 205 (1922)); Franklin Cal. Tax-Free Tr. v. Puerto Rico, 805 F.3d 322, 344–45 (1st Cir. 2015); see also below at 64-67 and cases cited. Unfortunately for Cotto, that's just what happened here.!

After an investigation, federal prosecutors charged Cotto in the United States District Court for the District of Puerto Rico with transporting a minor "in interstate or foreign commerce, or [as relevant here] in any commonwealth, territory or possession of the United States" with the intent to engage in criminal sexual activity — a federal crime under the Mann Act of 1910 (as amended) that carries a mandatory minimum sentence of ten

years in prison.  18 U.S.C. § 2423(a).[1]  Cotto was tried, convicted, and sentenced to ten years in federal prison.  She now appeals.

She makes four main arguments.  First, she contends that § 2423(a), like its counterpart covering adult victims, see United States v. Maldonado-Burgos, 844 F.3d 339, 349–50 (1st Cir. 2016) (construing 18 U.S.C. § 2421(a)), only applies to transportation in "interstate or foreign commerce" with respect to Puerto Rico (that is, to travel to or from the island); and since she never left Puerto Rico with the victim, the drive wasn't a federal crime.  Second, even if § 2423(a) covers intra-Puerto Rico travel, there was insufficient evidence to prove she drove the victim anywhere — even within Puerto Rico.  Third, the judge confused the jury by explaining the elements of the Puerto Rico crimes (of "sexual assault" and "lewd acts") the government alleged she'd intended to commit at her destination.  And fourth, the judge should not have let the victim testify by two-way videoconference, which violated Cotto's Sixth Amendment right to confront her accuser in person.

---

[1] In a related case heard on the same day as this one, see United States v. Montijo-Maysonet, No. 18-1640, defense counsel reported that Puerto Rico is the only place where the government has prosecuted wholly local conduct like Cotto's under § 2423(a), based on her search of the judiciary's Public Access to Electronic Records system.  When we followed up during oral argument in this case, the government responded that it was not aware of any such case brought in any other United States territory outside of Puerto Rico.

- 4 -

Here are the spoilers.  We disagree with all but one of Cotto's gripes.  Namely:  § 2423(a)'s ban on transporting a minor to commit a sex crime, unlike § 2421(a)'s general prohibition, applies to transportation within Puerto Rico, which is a "commonwealth . . . of the United States" under the statute; there was ample evidence to find Cotto guilty; and the judge properly instructed the jury on the local crimes Cotto allegedly drove the victim to the motel to commit.  However, we hold that the judge violated Cotto's Sixth Amendment right to in-person confrontation when he allowed the victim to testify by two-way close-circuit television ("CCTV") under a misreading of Maryland v. Craig, 497 U.S. 836, 855–56 (1990), and without making the specific "on the record" findings that 18 U.S.C. § 3509(b)(1)(C) and Craig require. On these unique facts, we conclude that the appropriate remedy is to reverse Cotto's conviction and remand for a new trial.

**HOW WE GOT HERE**

**The Crime**[2]

Cotto started teaching at Escuela Manuel Torres Villafañe, a public school in San Lorenzo, Puerto Rico, in August 2015.  Before long, other teachers started to notice that a 14-year-old ninth grader — we'll call him "YMP" — wasn't finishing

---

[2] Since Cotto makes a sufficiency challenge, we tell the story from the government's perspective so far as the evidence reasonably supported the inferences the government draws.  See United States v. Tanco-Baez, 942 F.3d 7, 15 (1st Cir. 2019).

his schoolwork and would often skip class to spend time alone with Cotto. One day, a teacher walked by Cotto's classroom and saw her alone with YMP holding hands. As it turns out, that was the tip of the iceberg. By November, Cotto and YMP were messaging each other constantly through WhatsApp (the smartphone application). Cotto told YMP that she loved him, that "if you were older, I would already be by your side," and proposed that they have sex. In January, she planned how to do it without getting caught: "I prefer to go into that motel than out front in the car because it's not safe," she wrote. She told him she'd take steps to make sure she didn't get pregnant. She also bought him gifts — facial creams and an expensive watch for Valentine's day — and left love notes in his school bag. All the while, Cotto stressed the need to keep their relationship hidden. "I have left a lot for you," she messaged him, "and risk myself every day, to losing even my job." "We have to hide babe" (she wrote); "[i]f your mom makes a complaint, well, then the biggest scandal in the world explodes." On February 3, 2016, they went to a nearby motel and had sex for the first time.

A month later, on March 1, 2016, YMP told a school staff member that he needed to leave early to go to the barbershop and his grandmother's house. In reality, just after noon, he walked to the restaurant La Casa de Abuela (which, to be fair, translates to "Grandmother's House"), where he and Cotto had planned for her

- 6 -

to pick him up. YMP testified that about five minutes after he got to the restaurant, Cotto arrived in her gray Kia Rio, YMP got into the passenger seat, and they drove to Motel Oriente. When they got there, Cotto drove into the carport and paid through a window. They went to a room on the second floor and had sex. Meanwhile, tipped off that something was up, the school social worker and a volunteer went to the barbershop and YMP's grandmother's house and learned that YMP hadn't been to either. Around three hours later, Cotto dropped off YMP on a road near the restaurant and he walked back to school, where the principal and YMP's mother were waiting for him. Initially, YMP told those adults and his friends that he hadn't been with Cotto that day. But later, YMP revealed that he had been.

### The Trial

Cotto was charged under 18 U.S.C. § 2423(a), which (along with §§ 2421-24) codifies the Mann Act of 1910, Pub. L. No. 61-277, § 2, 36 Stat. 825 (1910), as amended in the Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 103, 112 Stat. 2974, 2976 (1998) (the "Protect Act").[3] Section 2423(a) provides that anyone "who knowingly transports" someone under eighteen years old "in interstate or foreign commerce, or in

---

[3] We chronicled the post-1910 amendments to the Mann Act in Maldonado-Burgos, 844 F.3d at 341 n.3.

any commonwealth, territory or possession of the United States with intent that [the minor] engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined . . . and imprisoned not less than 10 years or for life."  18 U.S.C. § 2423(a).  Cotto twice moved to dismiss the indictment, arguing both times that § 2423(a) requires transportation across state or territorial lines and doesn't cover trips from one place to another within Puerto Rico.  But the judge denied both motions, finding that Puerto Rico is a "commonwealth" within the meaning of the Act.  See United States v. Cotto-Flores, No. Cr. 16-206, 2016 WL 5818476, at *2-3 (D.P.R. Oct. 5, 2016).  Having upheld the indictment, the judge set the case for trial.

Several days before trial, the government filed a motion to have YMP testify by two-way closed-circuit television ("CCTV") under 18 U.S.C. § 3509(b) (permitting that procedure if the government shows the victim can't testify in the defendant's presence "because of fear" or because expert testimony has established a "substantial likelihood" (s)he "would suffer emotional trauma from testifying," among other reasons).[4]  Cotto

---

[4] Section 3509(b)(1)(D) describes how the procedure works: essentially, it's a two-way videoconference.  The witness, the prosecutor, and the defendant's attorney go to a separate room, while the judge, jury, and defendant stay in the courtroom.  The attorneys for each side then question the witness in the separate room (conducting direct and cross examination) while a camera transmits the live video/audio feed of the minor to a

opposed the request, arguing that remote testimony wasn't necessary and would violate the Sixth Amendment Confrontation Clause; in her view, YMP had to testify in open court in Cotto's presence. But the judge disagreed. Long story short (we'll give you the details when the time comes), after interviewing YMP in chambers, the judge found YMP would be unable to testify in court in front of Cotto, granted the government's motion, and permitted YMP to testify via two-way CCTV.

So at trial, the Assistant United States Attorney ("AUSA" for short) and Cotto's attorney questioned YMP in a separate room, with his testimony streamed via CCTV to Cotto, the judge, and the jury in the courtroom. See 18 U.S.C. § 3509(b)(1)(D). YMP could see Cotto and she could see him. See id. He testified to the WhatsApp messages, his relationship with Cotto, the trip to the motel, and the sex. In her defense, Cotto called one of YMP's classmates, who testified that he saw YMP leave school that day and get into a white car, not Cotto's car. But based on YMP's testimony, along with that of two other teachers, a school volunteer, the school social worker, the school director,

_____

monitor/speaker in the courtroom, where the defendant, judge, jury, and the public can see and hear the minor testify. Id. Meanwhile, thanks to another camera in the courtroom, the minor can see a live video stream of the defendant (on a monitor in the separate room) and hear the judge through a speaker while (s)he testifies. Id. The defendant must also be given a way to privately communicate with his defense attorney during the testimony. Id.

- 9 -

YMP's mother, and several government investigators, the jury found Cotto guilty.

After the last government witness, then again after the guilty verdict, Cotto moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. She repeated her claim that § 2423(a) requires the defendant to have transported the minor across state or territorial lines, and she urged that even if § 2423(a) applied to drives from here to there within Puerto Rico, there was no evidence Cotto drove YMP to the motel as charged. The judge denied those motions and sentenced her to the mandatory minimum of ten years in prison. Needless to say, Cotto appealed.

## ANALYSIS

### Applying § 2423(a) within Puerto Rico

On appeal, as she did below, Cotto first argues that her case should never have gone to trial because § 2423(a) does not apply to the conduct she was charged with — transporting a minor within Puerto Rico to commit a sex crime. In the fifty states, that section only applies if the defendant transported the victim "in interstate or foreign commerce." In Cotto's view, the same is true in Puerto Rico, which is (since 1952) a "self-governing Commonwealth" vested with "state-like autonomy." United States v. Maldonado-Burgos, 844 F.3d 339, 340, 348–50 (1st Cir. 2016) (first quote quoting Puerto Rico v. Sánchez Valle, 136 S. Ct. 1863, 1874

(2016)).  In fact, she reminds us, in Maldonado-Burgos, we held that another section of the Mann Act (18 U.S.C. § 2421(a), which penalizes transporting *anyone* "in interstate or foreign commerce, or in any Territory or Possession of the United States" to commit a sex crime) did not apply to travel within Puerto Rico.  844 F.3d at 349–50.  Cotto urges us to read § 2423(a) in the same way.  If she's right, then the judge should have dismissed the indictment, which never alleged Cotto took YMP beyond Puerto Rico.  On the other hand, the government insists the plain text of § 2423(a) (which covers the transportation of a minor "in any commonwealth, territory, or possession of the United States" to commit a sex crime) shows that unlike its more general cousin, § 2423(a) covers intra-Puerto Rico transportation.

Despite Cotto's objections, we have to agree with the government.  Cotto has this much right though:  given its promise to grant Puerto Rico state-like status, we don't lightly conclude that Congress intended to exercise a police power — like the power to define, prosecute, and punish local crime — in Puerto Rico that the law elsewhere reserves for state governments.  See Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 42 (1st Cir. 1981); see also Morrison, 529 U.S. at 618 ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication

- 11 -

of its victims."). In this case, however, the plain words of the Protect Act (which amended § 2423(a) to specifically add the word "commonwealth"), compel that conclusion. So unlike § 2421(a), § 2423(a) applies to a defendant who transports his or her victim wholly within Puerto Rico.

Like any question of statutory interpretation, whether and how a statute applies to Puerto Rico depends not only on the "words in the statute," but also "the context, the purposes of the law, and the circumstances under which the words were employed." Maldonado-Burgos, 844 F.3d at 347 (quoting Cordova, 649 F.2d at 38). So here, as in Maldonado-Burgos, Puerto Rico's transition into a "self-governing Commonwealth" sets the stage for our analysis. Id. at 340-41. To start then, we'll retrace that historical current and reinforce the strong tug it exerts against the government when it claims that a federal law regulates conduct in Puerto Rico that the law doesn't reach in the states. See id. at 342-43 (citing Cordova, 649 F.2d at 42). With that background in place, we'll come back to the statute's text.

*Puerto Rico's Commonwealth Status under Federal Statutes*

Before Puerto Rico became a "commonwealth," that is, for its first fifty-four years as a United States territory, its internal affairs were almost entirely "subject to the command of Congress," Cordova, 649 F.2d at 39, and a local government largely run by federal appointees, see Sánchez Valle, 136 S. Ct. at 1868.

- 12 -

Starting in 1900 (under the Foraker Act), "[t]he U.S. President, with the advice and consent of the Senate, appointed the governor, supreme court, and upper house of the legislature," although "the Puerto Rican people elected the lower house themselves." Id. Over time, Congress gave the Puerto Rican people limited self-government over local affairs but kept a firm grip on levers of colonial control. See Cordova, 649 F.2d at 39. In 1917, the Jones Act granted Puerto Ricans U.S. citizenship and the right to elect both houses of the local legislature. See Sánchez Valle, 136 S. Ct. at 1868. But the U.S. President still appointed the territory's most powerful executive and judicial officers (including the governor, the attorney general, the commissioner of education, and the justices of the Puerto Rico Supreme Court);[5] and federal law required the Puerto Rican legislature to report all its acts to the federally-appointed governor and to Congress, which could veto them. See Cordova, 649 F.2d at 39; Jones Act of 1917, §§ 12-13, 34, 40, 39 Stat. 951, 960-61 (Mar. 2, 1917). Moreover, "in cases of conflict, Congressional statute, not Puerto

---

[5] In 1947, Congress amended the Jones Act to let Puerto Ricans elect the governor "and granted that Governor the power to appoint all cabinet officials," but the United States "President retained the power to appoint (with Federal Senate confirmation) judges, an auditor, and the new office of Coordinator of Federal Agencies." Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC, 140 S. Ct. 1649, 1660 (2020) (citing Act of Aug. 5, 1947, ch. 490, §§ 1, 3, 61 Stat. 770, 771).

- 13 -

Rico law, would apply no matter how local the subject." Cordova, 649 F.2d at 39 (citing the Jones Act, §§ 37, 57, 39 Stat. at 964, 968).

The tectonic plates shifted in 1950, which marked "a significant change in the relation between Puerto Rico and the United States." Id. That year, under mounting pressure from Puerto Rico's leaders and the international community, Congress authorized Puerto Rico to call a convention to draft its own constitution, which would take effect when ratified by popular referendum in Puerto Rico and approved by Congress. See Act of July 3, 1950, Pub. L. 600, § 1, 64 Stat. 319 ("[F]ully recognizing the principle of government by consent, this Act is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption."). Two years later, when Congress approved the new constitution, it repealed the inconsistent provisions in the Jones Act and rechristened the remainder the Puerto Rico Federal Relations Act (the "PRFRA"), which (along with the U.S. Constitution) is now the cornerstone of the island's legal relationship with the federal government. See id. §§ 4, 5, 64 Stat. at 320. Puerto Rico thus emerged from the process "a new kind of political entity, still closely associated with the United States but governed in accordance with, and exercising self-rule through, a popularly ratified constitution." Sánchez Valle, 136

- 14 -

S. Ct. at 1874. Or as we've put it, "Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth": the name the new constitution and the statute approving it gave the new polity. Cordova, 649 F.2d at 41; see P.R. Const. art. I, § 1 ("The Commonwealth of Puerto Rico is hereby constituted."); Act of July 3, 1952, Pub. L. 447, 66 Stat. 327 (approving "the constitution of the Commonwealth of Puerto Rico").

The Puerto Rico constitutional convention chose that label ("commonwealth") because in the delegates' view, it reflected Puerto Rico's "legislative autonomy in local matters." Cordova, 649 F.2d at 40. As the convention explained:

> the single word 'commonwealth', as currently used, clearly defines the status of the body politic created under the terms of the compact existing between the people of Puerto Rico and the United States, i.e., that of a state which is free of superior authority in the management of its own local affairs but which is linked to the United States of America and hence is a part of its political system in a manner compatible with its federal structure.

P.R. Const. Convention Res. 22 (P.R. 1952).

Congress ratified that understanding when it approved the Puerto Rico constitution and passed the PRFRA, acts which (according to the Supreme Court) "relinquished [Congress's] control over [Puerto Rico's] local affairs" and granted the island "a measure of autonomy comparable to that possessed by the States." Sánchez Valle, 136 S. Ct. at 1874 (quoting Examining Bd. of Eng'rs,

- 15 -

Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 597 (1976)); see also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 673 (1974) (holding that Puerto Rico was a "State" under the federal statute requiring that a three-judge panel convene to consider any challenge to a state statute; reasoning that the Commonwealth, like a state, is "sovereign over matters not ruled by the [U.S.] Constitution," unlike "a territory whose local affairs are subject to congressional regulation"); Cordova, 649 F.2d at 40 (reviewing the 1950-52 legislative history and concluding that "Commonwealth represents the fulfillment of a process of increasing self-government over local affairs by the people of Puerto Rico" and an "end" to its "subordinate status"). And in 1953, the executive branch assured the United Nations that Public Law 600, the PRFRA, and the Puerto Rico constitution gave the new commonwealth the authority to respond to Puerto Rican voices free from federal "interference with matters of local government."[6]

---

[6] In 1953, the U.S. State Department, seeking to have Puerto Rico classified as a "self-governing territory" (which freed the United States from certain international obligations with respect to the island), wrote in a memorandum to the United Nations that "Congress ha[d] agreed that Puerto Rico shall have, under [its] Constitution, freedom from control or interference by the Congress in respect of internal government and administration, subject only to compliance with applicable provisions of the Federal Constitution, the [PRFRA] and the acts of Congress authorizing and approving the Constitution, as may be interpreted by judicial decision." Cordova, 649 F.2d at 40-41 & n.28. And it assured the

In at least one way, these broad brushstrokes exaggerate the rights the 1950-52 Acts granted Puerto Rico and its people. Under the U.S. Constitution, Puerto Rico is still a "Territory," meaning that Congress (acting under its power to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," U.S. Const., Art. IV, § 3, cl. 2), "may treat Puerto Rico differently from the States so long as there is a rational basis for its actions." United States v. Vaello-Madero, 956 F.3d 12, 20 (1st Cir. 2020) (quoting Harris, 446 U.S. at 651-52); Franklin Cal. Tax-Free Tr., 805 F.3d at 344 (holding that "the limits of the Tenth Amendment do not apply to Puerto Rico" because it is "still *constitutionally* a territory" and its "powers are not 'those reserved to the States' but those specifically granted to it by Congress under its constitution" (quoting U.S. Const. amend. X)). Before 1952, we held (following Supreme Court precedent) that Congress may use that power under the Territory Clause to regulate purely local crime or other internal affairs in Puerto Rico that Congress could not reach in the states. See

---

members that "[t]hose laws which directed or authorized interference with matters of local government by the Federal Government ha[d] been repealed." Id. at 41 n.28. Presidents Truman and Kennedy made similar statements in other official memoranda. See id. at 40-41 (quoting President Truman's recognition, in transmitting the draft constitution to Congress, that its approval would vest "full authority and responsibility for local self-government . . . in the People of Puerto Rico").

Crespo v. United States, 151 F.2d 44, 45 (1st Cir. 1945). We assume (because Cotto does not dispute) that even after 1952, Congress may still regulate such intra-Puerto Rico conduct, even if doing so would break the promises it made that year. See below at 68-70; United States v. Lopez Andino, 831 F.2d 1164, 1172-75 (1st Cir. 1987) (concluding that the Court in Harris "reaffirmed the existence of Congress's post-1952 plenary power over Puerto Rico pursuant to the Territory Clause," and the PRFRA is not a true "compact" but "merely an Act of Congress" that "does not bind future Congresses"). But see Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC, 140 S. Ct. 1649, 1677-83 (2020) (Sotomayor, J., concurring) (arguing that, to the contrary, the 1952 legislation may well have been a "compact" that may place limits on Congress's power to regulate Puerto Rico).[7]

In other words, we need not decide whether the 1952 legislation restricts Congress's power to legislate in Puerto Rico. Rather, "this case requires us [only] to answer a question of congressional intent," Maldonado-Burgos, 844 F.3d at 345: what did Congress mean to do when it amended § 2423(a) to include the

---

[7] Thus, in case there's any room for doubt, we need not and do not decide that the 1952 legislation constitutes a "compact" between the United States and Puerto Rico that differs from a regular statute; and we do not suggest that there is some basis other than the Territory Clause on which Congress may criminalize illicit transportation within Puerto Rico that does not affect interstate commerce. Contra below at 70.

word "commonwealth"?  So for present purposes, what's important is that Congress's commitment in the PRFRA to give Puerto Rico state-like autonomy in its local affairs, see Sánchez Valle, 136 S. Ct. at 1874, has *at least* the force of federal statute, see Lopez Andino, 831 F.2d at 1174–75 (Torruella, J., concurring), subject to repeal only by an express statement or clear implication in later legislation, see Aurelius, 140 S. Ct. at 1677 (Sotomayor, J., concurring) (quoting Carcieri v. Salazar, 555 U.S. 379, 395 (2009)).  That commitment (as we and the Court have construed it) forms the backdrop against which Congress now legislates when it comes to Puerto Rico and "informs Congress's intent" when it does so.  Jusino Mercado v. Puerto Rico, 214 F.3d 34, 44 (1st Cir. 2000).

## *Cordova/Maldonado-Burgos*

That background plays an especially critical role when, as here, we're asked to construe another federal statute "to intervene more extensively into the local affairs of post-Constitutional Puerto Rico than into the local affairs of a state." Cordova, 649 F.2d at 42.  In such cases, we ask whether the "Act's framers, if aware of Puerto Rico's current [post-]constitutional status, would have intended it to be treated as a 'state' or a 'territory' under the Act."  Id. at 39.  That assumption comes with a corollary:  that, if the enacting Congress was aware of Puerto Rico's "commonwealth" status and long road to attaining it,

it would have acted with an intent to "fulfill [its] promise" to grant Puerto Ricans state-like self-rule free from the selective intervention of a federal government they do not elect.[8] Jusino Mercado, 214 F.3d at 44. With that pledge in mind, we do not read statutes "to treat Puerto Rico in one way and the states in another unless the language of [the] particular statute" or "some other compelling reason" in its structure, context, or legislative history demands that result. Id. at 42 (anchoring that rule in § 9 of the PRFRA, 48 U.S.C. § 734, which we read to "advise[] us with uncharacteristic bluntness that [Congress] does not intend a generally applicable statute to regulate Puerto Rico to the full extent allowed by the Constitution unless it either specifically singles out Puerto Rico or imposes similar regulations on the states"); see also Cordova, 649 F.2d at 42 (holding that "there would have to be specific evidence or clear policy reasons embedded in [a] statute to demonstrate" that Congress meant it to regulate more local conduct in "post-Constitutional Puerto Rico" than it does in the states).[9]

---

[8] Despite Public Law 600's peon to "government by consent," Puerto Rican residents do not have voting representatives in Congress, which can nonetheless regulate them; and to boot, they cannot vote for President. See Igartúa de la Rosa v. United States, 626 F.3d 592, 596 (1st Cir. 2010).

[9] Cordova established this framework in holding that the Sherman Antitrust Act did not apply to restraints on trade or commerce taking place wholly within Puerto Rico. 649 F.2d at 42.

In Maldonado-Burgos, we applied that test to § 2421(a) (which bans the transportation of "any individual in interstate or foreign commerce, or in any Territory or Possession of the United States" to commit a sex crime) and held that after 1952, that section no longer applies to travel wholly within Puerto Rico. 844 F.3d at 346-47.  The government had indicted a man who transported an 18-year-old woman with a severe mental disability within Puerto Rico to engage in unlawful sexual activity.  Id. at 340.  The district court dismissed the indictment.  Id.  On appeal, the government argued that the statute applied to Puerto Rico as a "Territory or Possession" and covered transportation within it, as we'd held in 1945.  See id. at 342-43 (citing Crespo, 151 F.2d at 45 (holding that it could "not be doubted that [§ 2421(a)] applie[d] to transportation within Puerto Rico," which was "a territory within the meaning of the Act")).  The government urged that despite the intervening developments, Crespo still controlled.  We disagreed; rather, we held that Cordova "blazed a trail" we had to follow.  Id. at 340.  As in Cordova, we asked the question Crespo hadn't answered:  whether "the Mann's Act framers, if aware" of Puerto Rico's "post-Crespo transformation from a [mere] United States territory to the 'self-governing Commonwealth' it is today," "would have intended it to be treated as a 'state' or 'territory' under the Act."  Id. at 340, 347 (first quoting Sánchez Valle, 136 S. Ct. at 1874; then quoting Cordova,

- 21 -

649 F.2d at 39). Reviewing the statute's text, legislative history, and the government's policy arguments (that human trafficking is a "pervasive problem" in Puerto Rico), we nonetheless found no "specific evidence or clear policy reasons embedded in § 2421(a)" to show that its framers would have meant to federalize the prosecution of local crime in the Commonwealth of Puerto Rico. Id. at 347–50. Thus, we concluded that § 2421(a) reaches "only transportation 'in interstate or foreign commerce' with respect to the island." Id. at 350. In other words, § 2421(a) reserves for Puerto Rico (as it does for states) the decisions of when to prosecute, and how severely to punish, illicit transportation that occurs wholly within its borders.

*Section 2423(a)*

In this case, Cotto urges us to extend Maldonado-Burgos and hold that § 2423(a) also requires cross-border travel and doesn't apply to drives from schools to motels within Puerto Rico. As we outlined in Maldonado-Burgos, however, § 2423(a) defines a separate crime against a distinct class of victims (minors) and uses language different from § 2421(a)'s "to identify the transportation covered." Id. at 351, n.11. Most damning, in 1998, Congress amended § 2423(a) to cover illicit transportation "in any *commonwealth*, territory, or possession of the United States." Id. at 350 n.10 (quoting the Protect Act, Pub. L. No. 105-314, § 103,

112 Stat. 2974, 2976) (emphasis added).[10] When it did so (we must assume), Congress was well "aware of Puerto Rico's [commonwealth] status," id. at 347, of Cordova, and of the parade of decisions in which the District of Puerto Rico had exempted "'intra-commonwealth' activities" from several important "statutes which, by their terms, appl[ied] to 'intra-territory,' but not to 'intra-state,' activities," Cordova, 649 F.2d at 38 & n.6, 42 (listing decisions holding that the Federal Firearms Act, the Federal Alcohol Administration Act, and the Sherman Act did not apply to wholly local activity in Puerto Rico). See Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1072 (2020) (explaining that courts "normally assume that Congress is 'aware of relevant judicial precedent' when it enacts a new statute" (quoting Merck & Co. v. Reynolds, 559 U.S. 633, 648 (2010)).[11] Against that background,

_____

[10] The Protect Act also amended § 2423(a) to increase the maximum penalty for violating that section and added enhanced penalties for repeat offenders. See Pub. L. 105-314, 112 Stat. at 2974.

[11] Of course, being one circuit among many, we might not normally assume that Congress has our caselaw in mind when it enacts legislation. As other circuits have recognized, however, given our jurisdiction over appeals from the District of Puerto Rico, our decisions have an outsized impact on how federal law applies to Puerto Rico. See Rodríguez v. P.R. Fed. Affairs Admin., 435 F.3d 378, 382 (D.C. Cir. 2006) (adopting our reasoning in Jusino Mercado and considering us "the court most expert on Puerto Rico's status"); see also United States v. Laboy-Torres, 553 F.3d 715, 719 n.3 (3d Cir. 2009) (according our decisions concerning the application of federal statutes to Puerto Rico "great weight"). In addition, by 1998, Cordova (which was authored by then-Judge Breyer), had been around for a while, and the Supreme Court had

- 23 -

there's only one plausible reason for the amendment:  to remove any doubt that § 2423(a) applied to the transportation of minors in non-state "commonwealths" like Puerto Rico.  See United States v. Medina-Ayala, 906 F. Supp. 2d 20, 22 (D.P.R. 2012) (concluding that "[t]here could hardly be a clearer [indication] of purpose than the specific addition of the word 'commonwealth' to the existing language of the Mann Act").[12]

In her effort to resist that conclusion, Cotto makes two main arguments.  First, she suggests that Congress must expressly call out "Puerto Rico" in the statute before we can read it to treat the island differently from the states.  But nothing in the PRFRA, Cordova, or Maldonado-Burgos lets us disregard Congress's

_____

cited it with approval to describe Puerto Rico's commonwealth status.  See Rodríguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982) (citing Cordova, 649 F.2d at 39-42).

[12] Four states (Massachusetts, Pennsylvania, Virginia, and Kentucky) and the Commonwealth of the Northern Mariana Islands ("CNMI"), all share the same "commonwealth" prefix.  But Cotto concedes that § 2423(a) doesn't cover transportation wholly within any state.  And for good reason, she does not argue that Congress added the word "commonwealth" to single out the CNMI, which enjoys an arguably even stronger presumption than Puerto Rico's that Congress does not selectively intervene in its local affairs.  See U.S. ex rel. Richards v. De Leon Guerrero, 4 F.3d 749, 754 (9th Cir. 1993) (explaining that when Congress "pass[es] legislation with respect to the CNMI" that "cannot also be made applicable to the several States[,] the Northern Mariana Islands must be specifically named therein for it to become effective in the Northern Mariana Islands" (quoting U.S.-CNMI Covenant, Pub. L. 94-241, § 105, 90 Stat 263, 264 (Mar. 24, 1976))).

clearly-expressed intent because it failed to use those two magic words.[13]  To the contrary, both decisions sought to "effectuate the intent of the lawmakers" expressed in "the words of the statute" and "the circumstances under which [they] were employed." Maldonado-Burgos, 844 F.3d at 347 (quoting Cordova, 649 F.3d at 38).  In those cases, unlike here, it was far from clear that the operative text of § 2421(a) and the Sherman Act (reaching conduct "in any territory or possession of the United States") was meant to reach intra-commonwealth activity.  And there was another, plausible way to read that text:  to apply only to pre-constitutional Puerto Rico and other territories that hadn't achieved state-like status.  To resolve the ambiguity, we relied on a background assumption about Congress's intent — that absent "specific evidence" or "clear policy reasons" to the contrary,

---

[13] Some laws — including the covenant between the CNMI and the United States — do say that Congress must recite certain words before its legislation can encroach on local sovereignty (among other sensitive areas).  See De Leon Guerrero, 4 F.3d at 753–54 (quoting U.S.-CNMI Covenant, Pub. L. 94–241, § 105, 90 Stat 263, 264 (Mar. 24, 1976)).  Per our higher-ups, statutes that require Congress to use such "express references" or "magical passwords" really create "less demanding interpretive requirement[s]" because they can't compel courts to "disregard [ ] the will of a later Congress" conveyed "either expressly or by necessary implication in a subsequent enactment."  Dorsey v. United States, 567 U.S. 260, 274 (2012) (first quoting Lockhart v. United States, 546 U.S. 142, 149 (2005) (Scalia, J., concurring); then quoting Great N. Ry. Co. v. United States, 208 U.S. 452, 465 (1908)).  So whether the 1952 Act could have required Congress to say "Puerto Rico" to regulate its local affairs implicates another question not briefed here:  whether that legislation was more than an ordinary statute that Congress may repeal without Puerto Rico's consent.

Congress would have meant to treat the Commonwealth like a state. Maldonado-Burgos, 844 F.3d at 350 (concluding based on the "clear *congressional intent* to grant Puerto Rico state-like autonomy" that "the [Mann] Act's framers, if aware of Puerto Rico's current constitutional status, *would have intended* it to be treated as a 'state'" and not a "territory" under § 2421(a) (quoting Cordova, 649 F.3d at 39) (relying on a "general *Congressional intent* to grant Puerto Rico state-like autonomy" to reach the same conclusion under the Sherman Act)); see also Jusino Mercado, 214 F.3d at 42 (explaining that was reasonable to assume Cordova's "default rule . . . inform[ed] *Congress's intent*") (emphases all added).

But, when "Congress has made its [contrary] intent clear," courts "must give effect to that intent," even if it defies our settled expectations. Miller v. French, 530 U.S. 327, 328 (2000) (internal quotation marks omitted); In re Palladino, 942 F.3d 55, 59 (1st Cir. 2019) ("Absent [a] constitutional challenge, when [we're] confronted with a clear statutory command . . . that is the end of the matter." (citing TVA v. Hill, 437 U.S. 153, 194 (1978)). So when a statute like § 2423(a) clearly means to reach more conduct in Puerto Rico than it does in the states, we have to enforce it as written, even if it doesn't single out "Puerto Rico" in so many words. See Dávila-Pérez v. Lockheed Martin Corp., 202 F.3d 464, 467-68 (1st Cir. 2000)(construing the words "Territory or Possession outside the continental United States," in light of

- 26 -

the statutory context and legislative history, to cover Puerto Rico); cf. Gregory v. Ashcroft, 510 U.S. 452, 460, 467 (1991) (explaining that despite the rule that Congress must speak "unmistakably" clearly to intrude on traditional state prerogatives, the statute at issue did not have to "mention [state] judges explicitly" to regulate their qualifications as long as it was "plain to anyone reading the Act that it cover[ed] judges"). Cordova doesn't license us to nullify Congress's "commonwealth" amendment; so we have to enforce its only reasonable meaning.

As her fallback, Cotto points to another clause in the Protect Act, Pub. L. No. 105-314, § 104(a), 112 Stat. at 2976, codified at 18 U.S.C. § 2426, which triples the maximum penalty for offenders who violate the updated Mann Act (§§ 2421-24) after being convicted of a prior sex offense "under State law." Section 2426(b) provides that "in this section," the term "State" includes "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States." There you have it, says Cotto: by defining "commonwealth[s]" as "states," § 2426(b) shows that Congress meant to treat Puerto Rico like a state in § 2423(a). But § 2426(b) defines "commonwealth[s]" as "states" *only* for the purposes of § 2426 — to broaden the reach of the repeat-offender penalties. So Cotto can't use § 2426(b)'s definition to narrow § 2423(a)'s plain meaning. Her concession that Congress used the term "commonwealth" to refer to Puerto Rico

elsewhere in the Protect Act only bolsters our conclusion that it did the same in § 2423(a).  See Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007) ("We presume that the same term has the same meaning when it occurs here and there in a single statute.").

So, like every federal judge in District of Puerto Rico to have addressed the question, we hold that § 2423(a) applies to the transportation of a minor within Puerto Rico for the purpose of committing a sex crime.[14]  Given that conclusion, the district court did not err in denying Cotto's motion to dismiss the indictment or her motions for judgment of acquittal based on the lack of evidence that she took YMP outside Puerto Rico.[15]

---

[14] See Santiago-Rivera v. United States, No. Cr. 14-742, 2019 WL 3365846, at *2 (D.P.R. July 25, 2019); United States v. Greaux-Gomez, 254 F. Supp. 3d 329, 332 (D.P.R. 2017); United States v. Montalvo-Febus, 254 F. Supp. 3d 319, 329 (D.P.R. 2017); United States v. Montijo-Maisonet, 254 F. Supp. 3d 313, 315 (D.P.R. 2017); United States v. Mercado-Flores, 109 F. Supp. 3d 467, 475 (D.P.R. 2015), adhered to, 124 F. Supp. 3d 55 (D.P.R. 2015), and vacated on other grounds, 872 F.3d 25 (1st Cir. 2017); Cotto-Flores, 2016 WL 5818476, at *2–3; Medina-Ayala, 906 F. Supp. 2d at 22.

[15] Cotto also urges that insofar as the statute covers transportation within Puerto Rico, it is unconstitutional because it exceeds Congress's power under the commerce clause.  But "Congress does not plainly lack plenary power under the Territorial Clause to criminalize certain intra-jurisdictional activity in [Puerto Rico] simply because it may not do so under the Commerce Clause within the fifty states."  United States v. Ríos-Rivera, 913 F.3d 38, 44 (1st Cir. 2019) (holding the district court did not plainly err in upholding § 2423(a) as a valid exercise of Congress's authority under the Territory Clause); Harris, 446 U.S. at 651–52 (holding that Congress may rely on the Territory Clause to "treat Puerto Rico differently from the States so long as there is a rational basis for its actions").  Cotto does not address

## Sufficiency of the Evidence

Cotto next argues that the government failed to prove that Cotto "transported" YMP anywhere (nevermind outside Puerto Rico). And even on our reading, the government had to prove that Cotto "transport[ed]" YMP "in [the] commonwealth" as an element of the offense. 18 U.S.C. § 2423(a). So as she sees it, even if we view all the evidence in a light most favorable to the verdict (as we must), the government's evidence lacked enough "bite" for a *reasonable* jury to find "that the government proved each of the elements of the charged crime beyond a reasonable doubt." Tanco-Baez, 942 F.3d at 15 (quoting United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999)). If Cotto is right, then she'd be entitled to a judgment of acquittal, not just a new trial. See Burks v. United States, 437 U.S. 1, 18, (1978) (holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient").

Her problem is that YMP testified in clear terms that Cotto picked him up at La Casa de Abuela and drove him to the Motel

---

these precedents or argue that § 2423(a) oversteps Congress's power to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," U.S. Const., Art. IV, § 3, cl. 2. Nor does she develop any argument that the statute, as we've interpreted it, lacks a "rational basis" (which would violate the Equal Protection Clause) or violates a U.S.-Puerto Rico compact. As such, we cannot conclude in this case that Congress lacked the authority to regulate illicit transportation within Puerto Rico. See Ríos-Rivera, 913 F.3d at 43-44.

Oriente to have sex. Cotto urges that YMP's testimony can't sustain her conviction because she "impeached" him "extensively"; another student (called by the defense) testified that he saw YMP get into a white car (Cotto's car was gray) that day, and on cross, YMP admitted he lied to his mom and school staff about where he'd disappeared to. But Cotto skates over the evidence that she herself urged YMP to lie in order to hide their relationship from his mother and school officials (and for obvious reasons). See above at 6. Of course, the jury didn't have to find YMP lied at trial simply because he'd fibbed to protect her two years earlier. Anyway, when testing the sufficiency of the evidence, we do not "assess the credibility of trial witnesses" or "resolve conflicts in the evidence," United States v. Gaudet, 933 F.3d 11, 15 (1st Cir. 2019) (quoting United States v. Hernández, 218 F.3d 58, 66 n.5 (1st Cir. 2000)); "that is a role reserved for the jury." United States v. Kanodia, 943 F.3d 499, 505 (1st Cir. 2019) (quoting United States v. Robles-Alvarez, 874 F.3d 46, 50 (1st Cir. 2017)). And based on the evidence the government presented, the jury was well within its rights to credit YMP's story of being carted off by Cotto, which school staff (testifying that Cotto left school early that day too), the WhatsApp messages, and the motel records corroborated.

Third, Cotto faults the judge for instructing the jury about the crime of sexual assault under Puerto Rico law.  Although we need not reach this issue, since we ultimately remand for a new trial, we address it to provide guidance on remand.  See Swajian v. Gen. Motors Corp., 916 F.2d 31, 35 (1st Cir. 1990).

To recap, to show Cotto violated § 2423(a), the government had to prove she transported YMP in Puerto Rico "with intent that [he] engage in . . . sexual activity *for which [someone] can be charged with a criminal offense*" (stress added).  And the judge told the jury precisely that, both before the trial (in a set of preliminary instructions) and after the close of evidence.  He then explained:

> Under the laws of Puerto Rico, criminal sexual activity includes the following conduct:  One, when a person performs or provokes another person to perform an oral-genital act or vaginal or anal sexual penetration, whether genital, digital, or instrumental, if the minor has not yet reached the age of 16 at the time of the event; or, number two, when a person purposefully, knowingly or recklessly, without consummating the conduct defined in the point above, submits another person to an act that tends to awake, excite, or satisfy the passion or sexual desires of the suspect, if the minor has not yet reached the age of 16 at the time of the event.

Though the judge didn't name them, he was describing the offenses of "sexual assault" and "lewd acts" under Puerto Rico law, P.R. Laws Ann. tit. 33, §§ 4770, 4772.  He followed up by reminding the

jury that the government need not prove Cotto committed those crimes; only that she "intended" to do so.

Cotto argues that these instructions about Puerto Rico crimes "unnecessarily confused [the jurors] by implicitly telling them to convict based on sexual assault instead of transportation of a minor," which she calls "a fatal flaw" in the trial that unfairly "tipped the scale in favor of conviction."

We test such "preserved claims of instructional error under a two-tiered standard: we consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues." United States v. Symonevich, 688 F.3d 12, 24 (1st Cir. 2012) (internal quotation marks omitted). The instructions here correctly stated the law, and Cotto gives us no reason to think they may have thrown off the jury. To know if Cotto intended to commit "sexual activity for which any person can be charged with a criminal offense," 18 U.S.C. § 2423(a), the jury had to know what kind of "sexual activity" constitutes a criminal offense in Puerto Rico. See United States v. Dávila-Nieves, 670 F.3d 1, 8 (1st Cir. 2012) (upholding the judge's decision to instruct the jury on the offense of sexual assault under Puerto Rico law in a prosecution under 18 U.S.C. § 2422(a), which prohibits enticing a minor to engage in "sexual activity for which

any person can be charged with a criminal offense," because "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury" (quoting United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 49 (1st Cir. 2004)); United States v. Rodríguez-Rodríguez, 663 F.3d 53, 58 (1st Cir. 2011) (reasoning that "[i]n order for the jury to determine" whether the defendant violated § 2422(b), "it had to be instructed on Puerto Rico law"). So, as the government notes, every circuit (including ours) with a pattern jury instruction for offenses using the phrase "sexual activity for which any person can be charged with a criminal offense" tells the district court to insert the allegedly intended criminal offense into the instruction and, in most cases, to describe its elements.[16] In this case, as in the cases just cited, following that convention was not an abuse of discretion.

### Testimony by Two-Way Television

However, Cotto's last challenge spells the end of the government's winning streak. Specifically, she argues that the judge violated her Sixth Amendment right to confront YMP in person

---

[16] See First Circuit Pattern Criminal Jury Instructions § 4.18.2422(b) (instruction for enticement of a minor under 18 U.S.C. § 2422(b)); Fifth Circuit Criminal Jury Instructions § 2.91 (for enticement of a minor under § 2422(b)); Sixth Circuit Pattern Criminal Jury Instructions § 16.10 (for § 2423(a)); Seventh Circuit Pattern Criminal Jury Instructions for § 2423(a); Eighth Circuit Pattern Jury Instructions § 6.18.2423A (for § 2423(a)).

when he permitted YMP to testify remotely through two-way CCTV. See above n.4 (describing the procedure). We'll start with the legal framework governing this claim before we explain how the judge misapplied it here and why the slip warrants a new trial.

*Law on Tele-Testimony*

In the ordinary case, the Sixth Amendment to the Constitution gives the defendant the right "physically to face" the witnesses who testify against her. Coy v. Iowa, 487 U.S. 1012, 1017, 1021 (1988) (holding that placing a screen in front of two child witnesses to block their view of the defendant while they testified against him violated the Sixth Amendment). The idea is that insisting that witnesses testify "in the presence of the person [they] accuse" helps ferret out the truth and lowers the risk of wrongful conviction. Id. at 1020. As the old wisdom goes, it is "more difficult to tell a lie about a person 'to his face' than 'behind his back.'" Id. at 1019 ("A witness 'may feel quite differently when he has to repeat his story looking at the man," or woman, "whom he will harm greatly by distorting or mistaking the facts.'" (quoting Zechariah A. Chafee, Jr., The Blessings of Liberty 35 (1956)). And, "even if the lie is told, it will often be told less convincingly" under the gaze of the defendant and jurors who can see the fibber's demeanor with their own eyes. Id. (explaining that the Constitution prescribes face-to-face confrontation as the best way to "confound and undo the false

accuser" and "reveal the child coached by a malevolent adult," even if it might "upset" honest victims who take the stand to implicate the guilty).

But, like the presumptions that underpin it, the constitutional right to unscreened in-person confrontation has its limits. See Craig, 497 U.S. at 844, 849 (holding that defendants do not have an "*absolute* right to a face-to-face meeting with witnesses against them at trial"). The state also has a "compelling" interest in protecting "minor victims of sex crimes from further trauma and embarrassment." Id. at 852 (quoting Globe Newspaper Co. v. Superior Court of Norfolk Cty., 457 U.S. 596, 607 (1982)). So, in sexual abuse cases, when "necessary" to elicit a minor victim's testimony without subjecting him or her to further trauma, "at least where such trauma would impair the child's ability to communicate," the court may allow the minor to testify from another room through CCTV — that is, as long as the minor still testifies under oath, subject to live cross-examination, "and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." Id. at 851, 857.

"The requisite finding of necessity," however, "must . . . be a case-specific one: The trial court must hear evidence and determine whether use of the [CCTV] procedure is necessary to protect the welfare of the particular child witness

who seeks to testify." Id. at 855. That entails two key findings: first, that the minor would be "traumatized, not by the courtroom generally, but by the presence of the defendant" (since otherwise, (s)he could testify "in less intimidating surroundings" with the defendant present); and second, "that the emotional distress suffered by the child witness in the presence of the defendant is more than . . . mere nervousness or excitement or some reluctance to testify." Id. at 856 (internal quotation marks omitted). The Maryland statutory procedure challenged in Craig (as the state court applied it) allowed testimony by CCTV if testimony "in the presence of the defendant" would cause the child to "suffer[ ] serious emotional distress such that the child could not reasonably communicate." Id. at 858. The Supreme Court held that standard passed constitutional muster. Id. After all, "where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that [it] would in fact *disserve* the Confrontation Clause's truth-seeking goal." Id. at 857 (citing, among other things, the Brief for American Psychological Ass'n as Amicus Curiae, Maryland v. Craig, 1990 WL 10013093, at 18–24 (1990) ("APA Brief") (discussing empirical evidence that a defendant's physical presence can influence child sex abuse victims to give less accurate, detailed, and complete testimony)).

In Craig's wake, Congress enacted 18 U.S.C. § 3509(b), which sets out alternatives to in-person testimony in child sexual

abuse cases. See Child Victims' and Child Witnesses' Rights Act of 1990, Pub. L. 101-647, § 225, 104 Stat. 4789, 4798 (Nov. 29, 1990). Among other things, the statute allows minor victims in such cases to testify from a room outside the courtroom by two-way CCTV if the court finds on the record "that the child is unable to testify in open court in the presence of the defendant . . . because of fear." 18 U.S.C. § 3509(b)(1)(B)(i). Since Cotto raises both statutory and constitutional challenges (and neither party distinguishes the two), we'll assume that the statute requires at least what the Sixth Amendment does. In other words, to satisfy § 3509(b)(1)(B)(i), the judge has to make "a specific finding" that if the minor testified "in the presence of the defendant" — even "in a less intimidating environment" — (s)he'd feel fear so severe "that [(s)he] could not reasonably communicate." Craig, 497 U.S. at 856, 858. Thus, "a generalized finding that the child suffers from fear [is not] enough to trigger closed-circuit testimony; the fear must be related to the prospect of testifying in the presence of the defendant." 136 Cong. Rec. H13288-02, H13296 (Oct. 27, 1990) (Statement of Rep. Edwards); accord United States v. Garcia, 7 F.3d 885, 887-88 (9th Cir. 1993) (concluding that Congress intended § 3509(b)(1)(B) to "codify[]

the requirement in Craig that the child be unable to testify in open court *due* to the presence of the defendant").[17]

Whether the trial judge made specific findings "sufficient to permit the use of closed-circuit television testimony . . . is a legal issue that we review de novo": that is, without deference. United States v. Turning Bear, 357 F.3d 730, 735–36 (8th Cir. 2004). When the judge makes the required findings, however, we review them for "clear error," United States v. Cox, 871 F.3d 479, 484 (6th Cir. 2017) (citing Hernandez v. New York, 500 U.S. 352, 364 (1991)), meaning we must defer to the judge's findings unless "after whole-record review — we have 'a strong, *unyielding* belief'" that the judge got the facts wrong. United States v. Rivera-Carrasquillo, 933 F.3d 33, 42 (1st Cir. 2019) (quoting Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41,

---

[17] Since neither party makes an issue of them, we've made two more assumptions here. First, we assume without deciding that the test announced in Craig (which involved *one*-way CCTV through which the witness couldn't see the defendant) also applies to the two-way CCTV procedure, as most circuits have held. Compare United States v. Carter, 907 F.3d 1199, 1207–08 & n.4 (9th Cir. 2018) with United States v. Gigante, 166 F.3d 75, 80–81 (2d Cir. 1999). Second, we assume (also without deciding) that the Supreme Court's later decision in Crawford v. Washington, 541 U.S. 36 (2004), which overruled a key case Craig relied on, did not modify Craig itself. See Carter, 907 F.3d at 1206 n.3 (holding that "while Craig and Crawford stand in 'marked contrast' in several respects, 'Crawford did not overturn Craig'" (quoting United States v. Cox, 871 F.3d 479, 492–95 (6th Cir. 2017) (Sutton, J., concurring)).

45 (1st Cir. 2013)).  That doesn't mean we let the findings stand whenever there's *some* evidence to support them.  As the Court has put it, "[a] finding is 'clearly erroneous' when *although there is evidence to support it*, the reviewing court on *the entire evidence* is left with the definite and firm conviction" the judge made a mistake.  Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)) (emphases ours).  But as long as the judge's finding is "plausible," we may not reverse it even if we're *sure* that "had [we] been sitting as the trier[s] of fact, [we] would have weighed the evidence differently."  Id. at 573-74.

So meeting the "clear error" standard is "no easy task"; it's "not enough that a finding strikes us as possibly or even *probably* wrong."  Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 312 (1st Cir. 2019).  It has to be "wrong with the force of a [five] week old, unrefrigerated, *dead fish*."  Id. (quoting O'Donnell, 728 F.3d at 46).  The bar is high for a reason.  When we review a transcript on appeal, we weren't there to see the testimony unfold live; unlike the trial judge, we didn't "see [the] witnesses face-to-face" or "appraise in person their demeanor and inflection."  United States v. Pérez-Díaz, 848 F.3d 33, 38 (1st Cir. 2017) (quoting United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015)).  We can't see the distress on someone's face, or hear the stress in their voice, by reading their words in 12-

point Courier New.  And unlike us, trial judges "listen to witnesses" and gauge their credibility "for a living."  Díaz-Alarcón, 944 F.3d at 311 (quoting Taglieri v. Monasky, 907 F.3d 404, 408 (6th Cir. 2018)).  So unless "objective evidence . . . contradicts a witness's story," or it's "so internally inconsistent or implausible that no reasonable factfinder would credit it," Pérez-Díaz, 848 F.3d at 38 (quoting Guzmán-Batista, 783 F.3d at 937), a judge's choice to believe a witness "can 'virtually never be clear error.'"  Cooper v. Harris, 137 S. Ct. 1455, 1478 (2017) (quoting Anderson, 470 U.S. at 575).  !

With that high standard in mind, we turn to YMP's in-chambers testimony and the judge's findings based on it.

*YMP's Testimony*

About a week before trial, the government filed a motion to have YMP testify by two-way CCTV under § 3509(b).  Cotto opposed the request, arguing that remote testimony wasn't necessary and would violate the Sixth Amendment.  The court tabled the matter until the day before YMP was set to testify.  When the time came on the fifth day of trial, the judge called a recess and interviewed YMP in his chambers with his mother and both sides' lawyers.

To begin, there were several rounds of questions:  first from the government (e.g., "Q: [H]ow do you feel [about] testify[ing] in open court?  A: Very bad."), then the defense,

- 40 -

which sought to paint YMP as a high-functioning scholar-athlete unaffected by Cotto's alleged crime:  he had decent grades in school (YMP agreed) and played on a traveling baseball team.  But on redirect, the government got back to the issue at hand.  The AUSA (that is, the attorney for the government) asked:

> **[AUSA]**: How would you feel about seeing [Cotto] in court today?
>
> **A**: Bad, uncomfortable.
>
> **[AUSA:]** How bad and how uncomfortable?
>
> **A:** Too much.
>
> **The Court**:  Would you be able to testify?
>
> **YMP**: No.

At that point, Cotto's lawyer jumped back in; he pointed out that "everybody is uncomfortable as a witness," and YMP had spoken in public before — he'd given interviews on sports radio.  YMP admitted he had.  But on the radio (YMP added), he'd been talking about baseball; he hadn't had to discuss this case.  So the government followed up:  "How would you feel if you were in that same radio station speaking about what is happening today in court?"  "Very, very, very bad," said YMP.  Then, the defense attorney stepped in once more:

> **[Defense Counsel]:**  And you feel bad because you don't want to talk about personal things; is that correct?
>
> **A:**  Yes.

**[Defense Counsel]:** But if you are compelled to do it and you have to testify, you will do it?

**A:** If I am compelled I wouldn't do it either.

**[Defense Counsel]:** If you are called as a witness for the prosecution, would you be conversant in answering her questions truthfully in open court?

**A:** No.

**The Court:** Why?

**YMP:** Because it's uncomfortable.

**The Court:** Well —

Cotto's lawyer cut in again: had the prosecution ever explained "[t]hat it is a normal process for you to testify as a witness at trial?" YMP was confused. "What do you mean, 'at trial'?" he asked. That's when the judge painted the picture. At "a trial," he explained:

> **The Court: . . .** there is a jury, and your mother and your father will be present, your lawyer will be present, the judge will be present, and the defendant . . . Yaira Cotto, she is entitled to be there. She is not going to be asking questions, but she is entitled to be there.
>
> **YMP:** That wouldn't be the best.
>
> **The Court:** Well, would you be able to testify? That's the issue.
>
> **YMP:** No.
>
> **The Court:** So you would not testify?
>
> **YMP:** No.
>
> **[Defense Counsel]:** May I ask something? Why? Why can't you do that?

**A:** Because, no, I don't feel comfortable.

**The Court:** And why would you feel not comfortable?

**YMP:** Because I don't want to see her. I don't want to be there.

**The Court:** Would that cause you to lose your tongue? Is that what you're telling me?

**YMP:** Yes.

**The Court:** Why?

**YMP:** Because I don't want to testify with her there. I don't want to be uncomfortable.

At that point, the judge dismissed YMP and his mother to confer with the lawyers.

"So counsel," the judge leveled (quoting from Craig), "mere nervousness or excitement or some reluctance to testify is not enough, but it has to be serious emotional distress such that the child cannot reasonably communicate." On that score, the judge was skeptical: YMP "seem[ed] to be in the middle[.]" So the lawyers skirmished over whether YMP expressed "fear" of testifying or just discomfort or "some reluctance" to do so. The judge noted that YMP had "a change of face when he stated, kind of annoyed, that he did not want to testify against her." The defense clapped back that "that per se doesn't mean fear" — and even if YMP felt fear, it would have to come from Cotto, and he hadn't said that he feared *her*. The judge responded that "[t]he fear can be fear to testify before a jury, fear to testify before other people, and

fear to testify before the judge.  There's many fears involved. It's fear."  Moving on, the judge had his clerk pull out a dictionary to find synonyms for "fear" and asked the interpreter how he'd translate them.  Then, he called YMP back in to get more specifics.

Using those synonyms for "fear," the judge asked YMP if "testifying in this case [would] subject you to distress?" (YMP said "yes"), "cause you to become agitated?" ("yes"), "cause you . . . great distress?" ("yes"), and "cause you some sort of apprehension or alarm?" ("yes").

> **The Court**:  And do you think — above all, do you think that this is fear that you would be — be causing yourself?"
>
> **YMP**:  Yes.
>
> **The Court**:  So all of those that I just stated, which is the one that really causes you to not be able to testify?
>
> **YMP**:  Seeing her, standing there; that I have never been there.
>
> **The Court**:  Have been where?
>
> **YMP**:  In the court.

On re-cross, Cotto's lawyer took aim at YMP's testimony that "seeing [Cotto] standing there" caused him fear.  He pointed out that in a statement YMP wrote for investigators two years earlier, YMP "didn't write that he was afraid of Mrs. Cotto."  "No," YMP admitted.

**[Defense Counsel]**: Because you didn't feel afraid of her; is that correct?

**A**: No.

**[Defense Counsel]:** And today you don't feel any fear for her either?

**A**: I am not afraid, but I do feel uncomfortable when I see her.

. . .

**[AUSA]**: How would you feel if you have to testify in front of Mrs. Cotto today in court?

**A**: Super bad, as I said before.

**[AUSA]**: And when you say "super bad," could you describe to the judge, what does that mean?

**A**: That I am going to feel nervous, anxious.

**[AUSA]**: Do you want to see Ms. Cotto?

**A**: No.

. . .

**The Court**: Does that bring fear to you by the fact that she is there?

**[YMP]**: Yes.

Unsatisfied, Cotto's lawyer followed up a final time:

**[Defense Counsel]**: What type of fear? Explain to us what type of fear can come to you.

**A**: I don't want to see her because I don't feel good when I see her. I don't want to see her and — I don't want to see her.

**[Defense Counsel]**: Is that it? That's all the —

**[AUSA]**: Do you fear her looking at you?

- 45 -

**A:**  Not necessarily.

**[AUSA]:**  What exactly do you fear?

**[Defense Counsel]:**  Let the record reflect that he has remained silent.

**The Court**:  No, let the record also reflect that he's become red in the face.

**[Defense Counsel]:**  He is blushing.

**The Court**:  Of course, he is blushing.  Fine.

**[Defense Counsel]:**  Okay.  But does that mean fear?

**[AUSA]:**  Yes.  Yes.

**[Defense Counsel]:**  He hasn't answered, Your Honor. The record should reflect that it's been almost 20 seconds and he hasn't answered.

**The Court**:  He's been getting red.

**[AUSA]:**  Let the record reflect, Your Honor, that we are talking with a 16-year-old minor.

**The Court**:  He is still a minor.  All right. Do we have any further questions?

They didn't.

Back in court, the judge granted the government's motion.  To start off, the judge "f[ound] that [YMP] demonstrated reluctance to testify and [had a] frightened demeanor, as he physically flushed (his face became red), his body choked, he started moving his legs, and expressed that his chest was tight on his left side by moving his right hand to his chest."  After describing YMP's testimony and noting that "the face-to-face

- 46 -

confrontation requirement is not absolute" but "not easily dispensed with" (quoting Craig), the judge then concluded:

> As such, the Court determines that there is a necessity to protect the welfare of this particular child witness who has demonstrated physical effects of fear as the Court asked specific questions using different synonyms of the word "fear," as the victim stated to the Court on every synonym used that he would either not testify *or was reluctant to testify* in the presence of the defendant in accordance with the requirements of [§] 3509.

(emphasis ours). When the trial resumed, YMP testified by two-way CCTV.

*Our Take*

Cotto argues that the judge failed to make the specific findings § 3509(b) and Craig together require, and even if he made the needed findings, the evidence didn't support them. Like Cotto, we doubt that YMP's testimony was sufficient to justify the use of CCTV. But we need not decide that issue — because in our view, the judge's use of the wrong legal standard and inadequate factual findings, set against the inconsistencies and gaps in the evidentiary record, warrant a new trial in this case.

As we said up front, § 3509(b) and Craig together demand more than a general conclusion that CCTV is "necess[ary] to protect the welfare" of the witness; they demand (as relevant here) a "specific finding" that the minor could not "reasonably communicate" in the defendant's presence because of fear. Craig, 497 U.S. at 856; 18 U.S.C. § 3509(b); see, e.g., Garcia, 7 F.3d at

888 (affirming use of CCTV based on judge's finding that "because of [her] fear of the defendant," the victim's "testimony would not be open, complete, and substantially helpful to the jury" if she testified with him present). Here, the judge made no such finding. Instead, his explicit findings concluded only "that [YMP] demonstrated reluctance . . . to testify" and "demonstrated the physical effects of fear" when the judge asked "specific questions" using various synonyms for it (which YMP answered affirmatively). But those "specific questions" were about "testifying in this case" generally; they did not ask YMP how he felt about Cotto, specifically. So the judge did not find that Cotto frightened YMP or that her presence (as opposed to the daunting courtroom setting) would make him "unable" to testify. 18 U.S.C. § 3509(b); see Craig, 497 U.S. at 857–58 (explaining that "[t]he question of whether a child is unavailable to testify . . . should not be asked in terms of inability to testify in the ordinary courtroom setting, but in the much narrower terms of the witness's inability to testify in the presence of the accused"). As such, the judge did not resolve the issues Craig made critical. See United States v. Bordeaux, 400 F.3d 548, 552 (8th Cir. 2005) (holding the trial court's finding "that [the child's] fear of the defendant was only one reason why she could not testify in open court" was inadequate because it "did not find that [her] fear of the defendant was the dominant reason" she couldn't testify) (citing Turning Bear, 357

F.3d at 737 (holding the trial court's finding that a "combination" of factors frightened the victim came up short because it "failed to separate out the effect on [the victim] of [the defendant's] presence")).

The judge's remarks earlier in the hearing clue us in to why he failed to make the needed findings. During the brief intermission in questioning, the defense pointed out that the government had to show "where [YMP's] fear comes from" (i.e., Cotto herself) and argued that YMP did not fear Cotto ("I have a statement from him here saying he is in love with the teacher, not that he feared her," he proffered). But the judge dismissed that argument, saying (incorrectly) that "the fear can be fear to testify before a jury, fear to testify before other people, and fear to testify before the judge," as long as it was "fear." In other words, he overlooked Craig's demand for a showing that YMP feared "the presence of the defendant" and not just the "courtroom generally." Craig, 497 U.S. at 856. Without that showing, CCTV may not have been "necessary," since YMP could reasonably have testified in "less intimidating surroundings" with Cotto there. Id.[18] The judge's misreading of Craig, and resulting failure to

_____

[18] For example, if the judge believed that the combination of the courtroom and the defendant's presence would interfere with YMP's testimony, he could have considered closing the courtroom to the public or permitting non-essential observers to watch from an overflow room. See 18 U.S.C. § 3509(e) (allowing the court to

- 49 -

make the needed findings, undermines his conclusion that CCTV was necessary. See Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982) ("[I]f a district court's findings rest on an erroneous view of the law, they may be set aside on that basis.").

Wait a second, says the government. In his oral decision, the judge "noted YMP testified that he felt 'greatly distressed and uncomfortable about testifying in court before the Defendant.'" Appellee's Br. at 38. And he also said that YMP "stated that he would be unable to testify if he were in front of the defendant," not just in the courtroom generally. But as the government implicitly concedes, while the judge may have "noted" that YMP made those statements, he didn't *find* that either of them were true. So, given the judge's earlier misstatement of the legal standard, we can't conclude he was adopting YMP's statements wholesale as his own findings of fact — at least not in this case, where YMP's testimony about his feelings toward Cotto, specifically, was equivocal at best.

---

close the courtroom to "all persons, including members of the press, who do not have a direct interest in the case" if open-court testimony "would cause substantial psychological harm to the child or would result in the child's inability to effectively communicate" and the order is "narrowly tailored to serve the government's compelling interest"); Craig, 497 U.S. at 852 (explaining that the court may exclude the "press and public" from the courtroom where the trial court makes "a case-specific finding that closure of the trial is necessary to protect the welfare of the minor" (citing Globe Newspaper Co., 457 U.S. at 608-09)).

Indeed, a firm finding on the key issue — whether YMP felt frightened and unable to testify *because of Cotto*, and not just the crowded courtroom — was especially needed on this shaky record. On that critical point, YMP never gave a clear answer. Twice, it's true, the judge asked YMP if he "[w]ould . . . be able to testify," and YMP said no. But both times, the judge was following up on questions about how YMP would feel about testifying *in court*, where (the judge made clear) "there is a jury, and [YMP's] mother and [his] father would be present" as well as Cotto. And when asked why he believed he wouldn't be able to testify, YMP gave two reasons: that he didn't "want to see Cotto" and that he didn't "want to be there" in court. A similar thing happened later — after YMP agreed that "testifying in this case" would cause him "fear" (and its synonyms). When the judge asked what "cause[d] YMP" to be afraid and not "able to testify," YMP gave the same two answers: one, "seeing [Cotto] standing there" and two, "that I have never been there . . . in court." In other words, YMP never singled out Cotto as the "dominant reason" he couldn't testify in court. Bordeaux, 400 F.3d at 552. So he never addressed whether he could testify in a less stressful setting with Cotto in the room. Craig, 497 U.S. at 856. And no one ever asked.

Fighting on, the government points out that when the judge asked YMP (albeit awkwardly) if "that brings fear to you by the fact that [Cotto] is there?" YMP said yes. But it reads that

- 51 -

statement in isolation — a luxury we don't have, see Anderson, 470 U.S. at 573 (tasking us to review "the entire evidence"). When pressed to explain, YMP clarified (as he had before) that he just didn't "want" to see Cotto because she made him "uncomfortable." Of course, not *wanting* to see Cotto — or feeling "nervous," "anxious," and "uncomfortable" around her (like virtually all witnesses do) — didn't mean she'd make him unable to "reasonably communicate" his story to the jury. See Craig, 497 U.S. at 856. And here's the real killer: when the defense asked him point-blank, YMP testified that he was "not afraid" of Cotto. With that plain statement etched in the record, we doubt it could have borne a finding that Cotto frightened YMP so much that she'd chill his testimony. See United States v. Moses, 137 F.3d 894, 898–99 (6th Cir. 1998) (reversing the judge's because-of-fear finding where the child testified she was "not afraid of" the defendant but didn't "want" to see him).

Let's be clear: we do not expect that child victims will always (or even usually) be able to explain "what exactly" they fear about testifying in the courtroom or give the clarity Craig requires; and nor could we, when the whole point is to figure out whether the witness can "reasonably communicate" in the defendant's presence. Craig, 497 U.S. at 856. But that's where expert testimony (while not required, United States v. Rouse, 111 F.3d 561, 569 (8th Cir. 1997)) can help fill in the gaps. See

Craig, 497 U.S. at 842 (noting that "expert testimony" had "suggested that each child [victim] would have some or considerable difficulty in testifying in Craig's presence"); Cox, 871 F.3d at 485 (affirming the use of CCTV where an expert witness examined the child and gave "particularized" and specific testimony that the defendant's presence would cause the child trauma and interfere with their testimony); APA Br. at 24 (recommending that "multiple sources of information, including expert testimony, should be sought in making an individualized determination whether there is a need to limit the defendant's right to face-to-face confrontation when a particular child victim testifies"). In United States v. Graham, for example, "the district court, on voir dire, found that" the 17-year-old victim was "extremely nervous and uncomfortable and fearful . . . and credited her statement that she was 'afraid' of facing [her trafficker] in court." 707 F. App'x 23, 28 (2d Cir. 2017). Still, the Second Circuit wrote that "[t]hese apprehensions of appearing for live testimony may fail to meet our demanding constitutional standard absent specific indicia of the emotional trauma the child witness would experience 'not by [testimony in] the courtroom generally, but by the presence of the defendant.'" Id. (quoting Craig, 497 U.S. at 856). What tipped the scales was a psychiatrist's finding (which the district court credited) that the witness would "be unable to reasonably communicate if forced to testify in the live presence of the

defendant." Id. Here in contrast, the government did not enlist an expert to examine YMP and help fill the holes or reconcile the contradictions in his in-chambers testimony.[19] And all told, that's left us with too little to go on.

As a result, *even if* the district judge intended to find that YMP was "unable to testify in front of [Cotto]," we could "[ ]not on this record . . . sustain [that] finding" without more explanation for how the judge arrived at it. United States v. Oquendo-Rivera, 586 F.3d 63, 68 (1st Cir. 2009). Ordinarily, we might not require a trial judge to explain *why* he found certain facts, at least when "the basis is plain from the record." Id. That's especially true when it comes to "credibility," which (as we've said) "is largely a matter for the fact-finder." Id. at 67. But that doesn't mean we can "insulate . . . findings from review by denominating them credibility determinations[.]" Anderson, 470 U.S. at 575. As the Supreme Court has explained, that's because

---

[19] Just before YMP testified in chambers, the government did present an expert who testified outside the jury's presence on "the general effects that boys suffer when they are the subject of sexual abuse, be it from a male or a female." "Hearing an expert's general testimony" on "the trauma a child may experience from testifying in court in a defendant's presence" "is not prohibited by Craig, so long as the testimony is not the sole basis for finding that an individual child would suffer emotional trauma from testifying in the presence of a defendant." Garcia, 7 F.3d at 889. However, the government wrote in its appellate brief that the expert's "testimony was unrelated to the issue of whether the minor should testify via two-way [CCTV]." Thus, it has waived any argument based on the expert's testimony.

factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

Id. Thus, when it appears (but is not certain) that "[d]ocuments or objective evidence . . . contradict[ed] the witness' story," or when the relied-on testimony seems "implausible" or "internally inconsistent" on a critical issue, we have required judges to give more explanation for their conclusions. See, e.g., Oquendo-Rivera, 586 F.3d at 67–68 (vacating revocation judgment based on the judge's failure to explain why he credited a key witness's story despite apparent contradictions in the evidence); United States v. Forbes, 181 F.3d 1, 7–8 (1st Cir. 1999) (vacating order denying a motion to suppress for the same reason); see also United States v. Lacouture, 835 F.3d 187, 191–92 (1st Cir. 2016) (vacating sentence because judge failed to explain why he credited child victim's statements in transcript of a forensic interview despite "apparent inconsistencies" in the child's story). "How much explanation" is needed "depends on the circumstances — for example, on the closeness of the case, the nature and extent of gaps or doubts" that plague the record, and the "suppositions" needed "to fill the gaps or answer the doubts." Oquendo-Rivera, 586 F.3d at 68. But the upshot is that "[i]n some cases, a result, possibly

defensible, may not have been adequately explained or supported."
Id. !

That's our conclusion in this case. Given the key gap in YMP's testimony — that he never testified he'd be unable to testify in front of Cotto even in less daunting surroundings — his equivocation on the other critical point (whether Cotto frightened him at all), and the lack of any other evidence such as expert testimony to clear up the muddle, we could not sustain the judge's because-of-fear finding (even if he had made one explicitly) without some explanation for how he filled in the gaps and untangled the apparent contradictions in YMP's testimony.[20]

---

[20] For example, if the judge had known to isolate YMP's feelings toward Cotto from his fear of the courtroom, the judge might have nonetheless explained that YMP's tone, inflection and demeanor suggested that Cotto was the main source of his distress. For example, when YMP testified that he feared "seeing her, standing there" *and* testifying in the courtroom, maybe he put the stress on "seeing her, standing there" (adding "that I've never been there . . . in court" as an afterthought). See Cooper, 137 S. Ct. at 1474 (noting that a judge's choices of how to construe and whether to credit live testimony get "singular deference" precisely "because the various cues that 'bear so heavily on [both] the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record." (quoting Anderson, 470 U.S. at 575). Of course, that train of thought would have hit the same roadblock we identify above — that when asked directly, YMP explicitly said he was "not afraid" of Cotto. But perhaps his demeanor colored those words too; perhaps the judge (with his own life experience the government's expert's testimony, see above at n.19, in mind) could have disregarded YMP's "I'm not afraid" as false bravado. But, given the constitutional right at stake, and the judge's misconception that he didn't need to suss out the source of YMP's fear, we decline to speculate about whether (and if so why) he credited some portions of YMP's testimony but not others. See Oquendo-Rivera, 586 F.3d at 68.

"Without [that] further explanation," "we would have a definite and firm conviction" that the evidence was insufficient to show that CCTV was needed.  Forbes, 181 F.3d at 8.

In sum, then, the trial judge applied an overbroad legal standard, failed to make the required "because-of-Cotto" finding, and didn't articulate the explanation necessary to support one (if the record permitted such a finding at all, which we don't decide). As a result, when the judge allowed YMP to testify by CCTV, he violated Cotto's right to confront YMP in person absent a compelling need for remote testimony.  See Craig, 497 U.S. at 855–56.

Nonetheless, the government tells us, Cotto's conviction can stand because she hasn't argued the error impacted the verdict (so she's "waived" any argument it did).  Appellee's Br. at 40. But it's the government, not Cotto, that must shoulder the burden to show that a constitutional violation was "harmless beyond a reasonable doubt."  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (citing Chapman v. California, 386 U.S. 18, 24 (1967)).  In answering that question, we have to assume that if Cotto had been allowed to confront YMP in person, "the damaging potential of [her] cross-examination" would have been "fully realized."  Id.  As the Supreme Court explained in Coy, when the trial court violates the defendant's right to face-to-face confrontation, our

> assessment of harmlessness cannot include consideration of whether the witness testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence.

487 U.S. at 1021-22. Rather, we focus on "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," and "the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684; see also Carter, 907 F.3d at 1210 (holding that the victim was wrongly permitted to testify by two-way CCTV and considering only the "remaining evidence" besides her testimony to hold that the error wasn't harmless).

Having scoured "the whole record" through that lens, we can't "confidently say" that "the constitutional error" here (letting YMP testify remotely without the required findings) was "harmless beyond a reasonable doubt." Van Arsdall, 475 U.S. at 681. First off, as we've explained in detail, it's not at all clear the judge would have permitted YMP to testify remotely if he'd applied the right legal standard, grappled with Cotto's independent impact on YMP's testimony, and made the more precise findings Craig requires. And if YMP *had* testified under the "truth-inducing effect" of Cotto's "unmediated gaze," Bordeaux, 400 F.3d at 554; Carter, 907 F.3d at 1207, he may well have changed

- 58 -

his story or told the same tale less convincingly. See Coy, 487 U.S. at 1020-22. The government points out that Cotto and YMP's text messages detailed their sexual relationship, and that school staff and records corroborated that both of them left school early on the day in question. Moreover, records from the motel placed Cotto's car in the motel's garage that afternoon. But without YMP's testimony, none of that evidence establishes that Cotto took *him* to the motel, or that she did so to have sex with him. So in the end, the government admits that "YMP's testimony" was "undoubtedly . . . important" because he "was the only witness to establish Cotto transported him to the Motel Oriente on March 1, 2016 with the intent they have sex," as charged in the indictment. Appellee's Br. at 41. Thus, if "the damaging potential of [YMP's] cross-examination were fully realized," Van Arsdall, 475 U.S. at 684, the jury could have reasonably doubted Cotto's guilt. Instead, it may well have believed the other student's testimony that YMP left school in a white car (not Cotto's gray Kia) and YMP's initial statements to school staff and his friends that he hadn't seen Cotto that day. See Moses, 137 F.3d at 902 (holding the error wasn't harmless when the child "provided the only eye-witness testimony" to the crime).

Which brings us to the remedy. When a trial judge fails to make required factual findings or provide an adequate explanation for his decision, we "normally" remand for him to

reconsider the evidence and make the appropriate findings, if warranted, or to reverse himself if not. See Pullman-Standard, 456 U.S. at 292; Forbes, 181 F.3d at 8 (remanding for the district court to "clarify and amplify the reasons for its factual findings or, perhaps, reconsider its conclusion"). However, we have broad discretion to craft the scope of our "remand in the interests of justice," United States v. Merric, 166 F.3d 406, 412 (1st Cir. 1999), and may also order a new hearing or trial when it would serve those interests, Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 88 (1st Cir. 1998) (holding that when a trial court excluded evidence on a mistaken basis, "[t]he choice of remedies (including whether to require a new trial or merely remand for further findings) [was] ours," and remanding for a new trial even though further findings might have justified excluding the proffered evidence on other grounds) (citing 28 U.S.C. § 2106); cf. Oquendo-Rivera, 586 F.3d at 69 (vacating defendant's revocation judgment and remanding for "more evidence and more explanation" before a different judge when the court didn't adequately explain why it credited the government's key witness); Andre v. Bendix Corp., 774 F.2d 786, 801 (7th Cir. 1985) (explaining that an appellate court may "remand[] for a new trial" when the judge fails to make sufficient findings of fact under civil rule 52(a) (citing 9C Fed. Prac. & Proc. Civ. § 2577 (1971))).

We think that's the appropriate course here. To begin with, when a trial judge has decided the facts — even under an incorrect legal standard — it can be hard "to put aside a belief sincerely arrived at and look at the evidence through fresh eyes." Oquendo-Rivera, 586 F.3d at 69 (reassigning the case on remand for that very reason); see also United States v. Hernández-Rodríguez, 443 F.3d 138, 148 (1st Cir. 2006) (explaining that we may remand "to a different district judge not only in recognition of the difficulty that a judge might have putting aside his previously expressed views, but also to preserve the appearance of justice"). For similar reasons, the interests of justice counsel against asking the judge to revisit his previous ruling that CCTV was necessary and find the missing facts.[21] In this case, the key finding needed to sustain Cotto's conviction by tele-testimony (i.e., that YMP could not have testified in Cotto's presence) has faint (at best) support in the evidence. To make it, the judge would have to rely on subtle variations in YMP's tone, pace, and demeanor when he gave certain answers. And he'd need to do so based on two-year-old testimony. See Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1184 (7th Cir. 1982) (remanding for a new

---

[21] As we note below, since YMP is now over eighteen and has aged out of § 3509(b)'s coverage, the judge would not have to revisit his CCTV ruling if the court holds a new trial. So we don't think it's necessary to order this case reassigned to a different judge — something Cotto has not requested.

trial, instead of for further findings, when the judge applied an incorrect legal standard because, among other things, "the trial ended a year [before] and the record" would be too "stale in the judge's mind"). We trust that if asked to do so, the judge would rise to the challenge and reconsider his previous ruling with an open mind. But if in doing so he sustains his previous finding, "it might appear that his determination was improperly influenced by his initial decision" instead of YMP's now-stale and barely sufficient testimony. Hernández-Rodríguez, 443 F.3d at 148.

Without a doubt, testifying in front of an abuser in court can "be more emotionally traumatic to [a] child than the initial abuse itself," no matter what his age or gender. H.R. Rep. No. 101-681(I) (Sept. 5, 1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6572; see Craig, 497 U.S. at 855 (citing the already-"growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court"). That's true for adults as well as children, though Craig and its offspring don't protect them. See 18 U.S.C. § 3509(b) (capping the age of covered witnesses at eighteen). So we do not lightly order a retrial, where (if the government chooses to prosecute), YMP (now over eighteen) would likely need to face Cotto again. But the right to confrontation is fundamental. See Pointer v. Texas, 380 U.S. 400, 404 (1965). It preserves not just the "perception," but also the "reality" of fairness in our criminal

justice system.  Coy, 487 U.S. at 1017 ("[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution.'" (quoting Pointer, 380 U.S. at 404)).  And Cotto faces ten years in prison without the chance to confront her key accuser.  We do not think that sustaining that result based on YMP's two-year-old chambers testimony — equivocal at best on whether he could face Cotto in person — would reasonably assure Cotto and the public that her conviction rests on a fair and just foundation.

## END

For those reasons, we are bound to hold that despite Congress's promise to grant Puerto Ricans state-like "autonomy" over their local affairs, see Sánchez Valle, 136 S. Ct. at 1874, and an "end" to their island's "subordinate status" under federal law, Cordova, 649 F.2d at 42, the Protect Act — though it refers to Puerto Rico as a "commonwealth" — treats the island as a "territory . . . belonging to the United States" and not as a member of the Union.  Shell Co., 302 U.S. at 257.  As a result, we affirm the judge's decision to sustain the indictment and hold there was sufficient evidence to sustain Cotto's conviction.

But because Cotto's trial violated her Sixth Amendment rights, we vacate her conviction and remand for a new trial.

**-Concurring Opinion Follows-**

**TORRUELLA**, **Circuit Judge, Concurring**.  Although I fully agree with the decision reached by the majority (as well as its reasoning) to reverse the conviction by reason of the violation of appellant's Sixth Amendment rights, I wish to express my disagreement with the manifestations made regarding Puerto Rico's constitutional status and related subjects.

The ***constitutional*** status of Puerto Rico was established by the infamous ***Insular Cases***:[22] it is that of an ***unincorporated territory***, whatever that means.  This is not a term you will find anywhere in the Constitution, but one by which the Supreme Court

---

[22]  See generally De Lima v. Bidwell, 182 U.S. 1 (1901) (holding that once Puerto Rico was acquired by the United States through cession from Spain it was not a "foreign country" within the meaning of tariff laws); Goetze v. United States, 182 U.S. 221 (1901) (holding that Puerto Rico and Hawaii were not foreign countries within the meaning of tariff laws); Dooley v. United States, 182 U.S. 222 (1901) (holding that the right of the President to exact duties on imports into the United States from Puerto Rico ceased with the ratification of the peace treaty between the United States and Spain); Armstrong v. United States, 182 U.S. 243 (1901) (invalidating tariffs imposed on goods exported from the United States to Puerto Rico after the ratification of the treaty between the United States and Spain); Downes v. Bidwell, 182 U.S. 244 (1901) (holding that Puerto Rico did not become a part of the United States within the meaning of Article I, section 8 of the Constitution); Huus v. N.Y. & P.R. S.S. Co., 182 U.S. 392 (1901) (holding that a vessel engaged in trade between Puerto Rico and New York is engaged in the coasting trade and not foreign trade).

of the time[23] used to validate Puerto Rico's *colonial status of inequality,*[24] and by which the Court supported the Manifest Destiny and American exceptionalism theories that were prevalent during the imperial period of the United States.  This ruling and the biased treatment of the residents of Puerto Rico that it promoted prevailed even after they were granted U.S. citizenship[25] and continues to the present day.  Although it is a status that is based on a rationale of racial inequality,[26] its flawed premises are ones that the Supreme Court has studiously avoided confronting, or even modifying, while at the same time creating no small amount of confusion by its kaleidoscope of decisions as to what this status stands for or encompasses **constitutionally** speaking, and notwithstanding the platitudes that are quoted as the need arises.

A brief sample of the confusing and contradictory language that has issued over the last century will suffice to illustrate this point.  The Court has ruled that under Puerto

---

[23]  Almost to a man, the same Court that validated <u>Plessy</u> v. <u>Ferguson</u>, 163 U.S. 537 (1896), overruled by <u>Brown</u> v. <u>Bd. of Educ.</u>, 347 U.S. 483 (1954).

[24]  <u>See</u> Juan R. Torruella, <u>The Insular Cases: The Establishment of a Regime of Political Apartheid</u>, 29 U. Pa. J. Int'l L. 283 (2007).

[25]  <u>Balzac</u> v. <u>Porto Rico</u>, 258 U.S. 298 (1922).

[26]  <u>See</u> <u>Downes</u>, 182 U.S. at 282, 286-87 (Brown, J. concurring). <u>See also</u> Rubin Frances Weston, <u>Racism in U.S. Imperialism: The Influence of Racial Assumptions on American Foreign Policy, 1893-1946</u>, at 15 (1972) ("The racism which caused the relegation of the Negro to a status of inferiority (during the Reconstruction Period) was to be applied to the overseas possessions of the United States.").

Rico's constitutional status as an unincorporated territory, Puerto Rico belongs to but is not a part of the United States;[27] that it is "foreign to the United States in a domestic sense";[28] that it is a jurisdiction over which Congress has plenary powers[29] pursuant to the Territorial Clause;[30] that its residents are only entitled to the constitutional protection of fundamental rights,[31] which does not include the right to trial by jury;[32] that all the granting of U.S. citizenship did for the residents of Puerto Rico was to allow them the right to enter the United States freely, and there exercise full citizenship rights if they became residents;[33] that state juries must reach unanimous verdicts;[34] and that Puerto Rico is like a state for purposes of the Three-Judge Court Act, 28 U.S.C. § 2281,[35] but lacks sovereignty in the context of the double

---

[27] Downes, 182 U.S. 244.

[28] Id. at 341.

[29] See Harris v. Rosario, 446 U.S. 651 (1980); Califano v. Gautier Torres, 435 U.S. 1 (1978).

[30] U.S. Const. art. IV, § 3: "The Congress shall have the power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."

[31] See Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 668-69 n.5. (1973).

[32] See Balzac, 258 U.S. at 304-06, 309. But compare Duncan v. Louisiana, 391 U.S. 145, 149 (1968) (holding that trial by jury is a fundamental right), and Reid v. Covert, 354 U.S. 1, 8 (1957) (same, and applies to prosecution of U.S. citizens outside the U.S.).

[33] See Balzac, 258 U.S. at 308.

[34] Ramos v. Louisiana, 140 S. Ct. 1390 (2020).

[35] Calero-Toledo, 416 U.S. at 673.

jeopardy clause notwithstanding that "Congress . . . 'relinquished its control over [Puerto Rico's] local affairs'" and granted the island "a measure of autonomy comparable to that possessed by the States."[36] Topping this contradictory list of haves and have nots we have the most downgrading of all actions validated by the Supreme Court pursuant to Congress's omnipotent powers under the territorial clause, wiping out all concepts of local autonomy and/or "compact" to which it had previously given lip service (erroneously, in my opinion), and setting Puerto Rico back to the unvarnished colonial regime that existed in the days of the Foraker Act[37] (which spawned the *Insular Cases*), imposing on the U.S. citizens of Puerto Rico an unelected board to run the territory over its elected government.[38]

It seems to me that much confusion and disenchantment would have been avoided had someone bothered to read the extensive evidence that is available as to what Congress intended and

---

[36] Puerto Rico v. Sánchez Valle, 136 S. Ct. 1863, 1874 (2016) (quoting Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 597 (1976)).

[37] 31 Stat. 77 (1900).

[38] See Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. § 2101 et seq.; see also, Fin. Oversight & Mgt. Bd. for Puerto Rico v. Aurelius Inv., LLC, 140 S. Ct. 1649 (2020).

actually did in enacting the bill that authorized the "creation"
of the "Commonwealth of Puerto Rico."[39]

Starting with the statute in question, as we must, one
cannot find an iota of language in that legislation, which simply
authorized a modicum of autonomy and self-government to the people
of Puerto Rico, that supports the contention that a new
**constitutional** status was being created, much less that one was
being established which superseded the existing unincorporated
territorial one.  If that statement is not convincing enough, even
though the language of Public Law 600 self-evidently supports it,
looking at the legislative history in the Congressional Record is
helpful.

On May 17, 1950, the Senate subcommittee considering
S. 3336, the precursor of Public Law 600, heard the testimony of
Puerto Rico's Resident Commissioner in Congress,[40] Dr. Antonio
Fernós-Isern, regarding the bill, and specifically regarding the

---

[39]  See Juan R. Torruella, The Supreme Court and Puerto Rico: The
Doctrine of Separate and Unequal 144-160 (1985).  See also David M.
Helfeld, "The Historical Prelude to the Constitution of the
Commonwealth of Puerto Rico," 21 Rev. Jur. U.P.R. 135 (1952) and
David M. Helfeld, "Congressional Intent and Attitude Toward Public
Law 600 and the Constitution of the Commonwealth of Puerto Rico,"
21 Rev. Jur. U.P.R. 255 (1952), both of which are excellent
contemporaneous accounts of what Congress intended in enacting
Public Law that authorized what became the "Commonwealth of Puerto
Rico," and are based on the evidence in the Congressional Record
and supporting official documentation.
[40]  Puerto Rico's non-voting Congressman.

"in the nature of a compact" phrase, which was causing uneasiness because of its Sphinx-like inscrutability. In that respect Fernós-Isern testified: "S. 3336 would not change the status of the island of Puerto Rico relative to the United States. . . . It would not alter the powers of sovereignty acquired by the United States over Puerto Rico under the terms of the Treaty of Paris."[41]

He had already testified in a similar manner the previous day before the House's committee dealing with H.R. 7674,[42] the counterpart to S. 3336, at which hearing the Secretary of the Interior testified that there would be no change in "Puerto Rico's political, social and economic relationship to the United States,"[43] a position also endorsed by Cecil Snyder, an Associate Justice of the Supreme Court of Puerto Rico, in his own testimony.[44] The Senate's report on S. 3336 succinctly stated on this point: "The measure would not change Puerto Rico's fundamental political, social, and economic relationship to the United States."[45]

This in a nutshell represents the understanding of Congress regarding Public Law 600, and in addition to which, I

---

[41] Puerto Rico Constitution: Hearing on S. 3336 Before a Subcomm. of the S. Comm. on Interior & Insular Affs., 81st Cong. 4 (1950).
[42] Puerto Rico Constitution: Hearings on H.R. 7674 and S. 3336 Before the H. Comm. on Pub. Lands, 81st Cong. 63 (1950).
[43] Id. at 50.
[44] Id. at 54.
[45] S. Rep. No. 81-1779, at 3 (1950).

refer the reader to the litany of supportive evidence summarized in the literature cited in footnote 39.

I further disagree with the majority's views, to the extent it relies on the existence of a "compact" between the United States and Puerto Rico. At most, the language used in Public Law 600 is "in the nature of a compact," which is a far cry from saying there is a "compact," which implies mutually *binding* promises, a situation which does not and cannot exist between Puerto Rico and the United States,[46] given Puerto Rico's unincorporated territorial status, which as previously demonstrated, is still validated by the Supreme Court.

I join the merits of this case notwithstanding its reliance on a "commonwealth" jurisdictional basis because, even ignoring the "commonwealth" issue, there is still jurisdiction to legislate intra Puerto Rico under the present Supreme Court case law regarding unincorporated territories. This alternate view validates the prosecution, and does not, however, affect my concurring with the majority on the outcome of this appeal.

---

[46] See Dorsey v. United States, 567 U.S. 260, 274 (2012) ("[O]ne Congress cannot bind a later Congress, which remains free to repeal [an] earlier [law]."); see also Christina D. Ponsa-Kraus, Political Wine in a Judicial Bottle: Justice Sotomayor's Surprising Concurrence in *Aurelius* (July 27, 2020), 130 Yale L.J. Forum _____ (Forthcoming 2020), available at SSRN: https://ssrn.com/abstract=3661668. But see Aurelius Inv., LLC, 140 S. Ct. at 1677-78 (Sotomayor, J., concurring in judgment) (noting that "[t]he truism that 'one Congress cannot bind a later Congress' appears to have its limits" (citation omitted)).